The **PROCTER & GAMBLE COMPANY, Plaintiff,**

v.

**NABISCO BRANDS, INC., Keebler Company and Frito–Lay, Inc., Defendants.**

**Civ. A. No. 84–333 LON.**

United States District Court, D. Delaware.

April 4, 1989.

See also 697 F.Supp. 1360 and —— F.R. D. ——.

Robert H. Richards, III, Richards, Layton & Finger, Wilmington, Del. (Jerome G. Lee, Harry C. Marcus, John F. Sweeney, Christopher A. Hughes, of Morgan, Finnegan, Pine, Foley & Lee, New York City, Julius P. Filcik, Rose Ann Dabek, Richard C. Witte, of The Procter & Gamble Co., Cincinnati, Ohio, of counsel), for plaintiff.

Douglas E. Whitney, Mary Graham, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Edward W. Greason, William J. Ungvarsky, Paul H. Heller, Richard M. Rosati, Richard L. DeLucia, Wayne A. Jones, of Kenyon & Kenyon, New York City, of counsel), for defendant Nabisco Brands, Inc.

Howard M. Handelman, of Bayard, Handelman & Murdoch, Wilmington, Del., Daniel M. Riess, David Lesht, of Lockwood, Alex, FitzGibbon & Cummings, Chicago, Ill., Craig S. Stevens, Walter S. Maker, of Keebler Co., Elmhurst, Ill., for defendant Keebler Co.

James F. Burnett, Esquire of Potter, Anderson & Corroon, Wilmington, Del. (Wayne M. Harding, Paul M. Janicke, Peter J. Shurn III, of Arnold, White & Durkee, Houston, Tex., Ronald R. Kranzow, Terrence D. Dreyer, Thomas P. Schur, of Frito-Lay, Inc., Dallas, Tex., of counsel), for defendant Frito-Lay, Inc.

## OPINION

LONGOBARDI, District Judge.

### I. NATURE AND STAGE OF THE PROCEEDINGS

The Plaintiff Procter and Gamble ("P & G") brought three separate actions against Defendant Nabisco Brands, Inc. ("Nabisco"), Defendant Keebler Company ("Keebler") and Defendant Frito-Lay, Inc. ("Frito-Lay") alleging infringement of U.S. Patent No. 4,455,333 (the "'333 Patent"), inducement of patent infringement and unfair competition. The complaint was filed on June 19, 1984, the date that the '333 Patent was issued to P & G for a cookie invention by two of its employees, Charles A. Hong and William J. Brabbs. The patent is entitled "Doughs and Cookies Providing Storage—Stable Texture and Variability." The claims of the '333 Patent at issue in this motion cover, in general, (1) the cookie ingredients or starting materials used to produce the patented cookie product; (2) a method of laminating two layers of cookie dough preforms together; and (3) the resultant product, a dual-textured cookie that is crispy on the outside and chewy on the inside manufactured by baking and tempering the laminated dough structure. P & G markets this dual-textured cookie under the Duncan Hines label.

The Defendant Nabisco markets its own line of dual-textured cookies under the "Almost Home" and "Chewy Chips Ahoy" labels. The Defendant Keebler manufactures a crispy and chewy cookie under the "Soft Batch" label. The Defendant Frito-Lay also produces a cookie with textual variability for its "Grandma's Rich and Chewy" brand of cookies. Each of the three Defendants has denied that their products infringe the '333 Patent and also denied P & G's allegations of unfair competition. In addition, each of the three Defendants has pleaded, *inter alia*, the various defenses of patent invalidity and unenforceability. Each of the Defendants has also filed declaratory judgment counterclaims asserting that all the claims of the '333 Patent are invalid and unenforceable.

Currently before the Court are three motions for partial summary judgment, one by Nabisco and two by Frito-Lay. In its motion, Docket Item ("D.I.") 227, Nabisco alleges that claims 19, 29 and 35 of the '333

Patent are invalid under 35 U.S.C. § 102(b) as anticipated by the Railroad Cookie recipe ("Railroad Cookie") which was published in a 1968 cookbook entitled *Food that Really Schmecks*. D.I. 228A, Exhibit 2 at A27–A28. At oral argument, this Court denied Defendant Nabisco's motion with respect to claims 19 and 29 but reserved decision with regard to the validity of claim 35. D.I. 641. In the second motion for summary judgment, D.I. 244, Frito–Lay contends that even if the final cookie product is novel, the method claims 35, 36, 37 and 45 used to manufacture the cookie are obvious and, therefore, unpatentable based upon the Federal Circuit's holding in *In Re Durden*, 763 F.2d 1406, 1408 (Fed.Cir. 1985). Finally, Frito–Lay has moved for partial summary judgment that claim 35 is invalid under 35 U.S.C. § 102(g) and that the entire '333 Patent is unenforceable due to alleged inequitable conduct by P & G before the U.S. Patent and Trademark Office (the "PTO"). D.I. 318. The Court will discuss each of the Defendants motions separately in this opinion.

## II. SUMMARY JUDGMENT

Summary judgment is appropriate in patent cases as in other cases under Rule 56(c), which provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1116 (Fed.Cir.1985); *Martin v. Barber*, 755 F.2d 1564, 1566 (Fed.Cir.1985). In addition, the Court must draw all reasonable inferences in favor of the non-moving party and must resolve all doubt over factual issues in favor of the party opposing summary judgment. *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986) (citing *SRI Intern.*, 775 F.2d at 1116). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). As to the materiality requirement, "the substantive law will identify which facts are material[;].... [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725 at 93–95 (1983)).

Moreover, summary judgment is not appropriate if the dispute about a material fact is "genuine", that is, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. In *Liberty Lobby*, the Supreme Court stated that the genuine issue standard for summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). As such, "the inquiry under each [standard] is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

Suits for patent infringement or the defense of anticipation often give rise to complex fact issues which render those issues inappropriate for summary judgment. The Federal Circuit, however, has upheld on occasion the grant of summary judgment in favor of accused patent infringers where there were no genuine issues of material fact and either the District Court had properly construed the claims or a finding of infringement would have been impossible. *See, e.g., George v. Honda Motor Co., Ltd.*, 802 F.2d 432, 434 (Fed.Cir.1986); *Porter v. Farmers Supply Service, Inc.*, 790 F.2d 882, 884 (Fed.Cir.1986); *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 654 (Fed.Cir.1984). Thus, the Federal Circuit has advised "[w]here no issue of material fact is present ... courts should not hes-

itate to avoid an unnecessary trial by proceeding under Fed.R.Civ.P. 56 without regard to the particular type of suit involved." *Chore–Time Equipment v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed. Cir.1983).

## III. NABISCO'S MOTION ON THE INVALIDITY OF CLAIM 35 UNDER 35 U.S.C. § 102(b)

In order to prove anticipation of a patent claim under 35 U.S.C. § 102, a party must demonstrate by clear and convincing evidence, *inter alia*, identity of invention. *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983); *Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 F.Supp. 1278, 1287 (D.Del.1987). Identity of invention is a question of fact. *Kalman*, 713 F.2d at 771 (citing *Coupe v. Royer*, 155 U.S. 565, 578–79, 15 S.Ct. 199, 204–05, 39 L.Ed. 263 (1895)); *see Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687, 689 (Fed.Cir.1985); *Lindemann Maschinenfabrik v. Am. Hoist and Derrick*, 730 F.2d 1452, 1458 (Fed.Cir.1984); *Phillips Petroleum*, 673 F.Supp. at 1287. As the Federal Circuit has noted:

> [O]ne who seeks such a finding must show that each element of the claim in issue is found, either expressly described or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice.

*Kalman*, 713 F.2d at 771, *quoted in Phillips Petroleum*, 673 F.Supp. at 1287; *see Great Northern Corp. v. Davis Core & Pad Co., Inc.*, 782 F.2d 159, 165 (Fed.Cir. 1986); *Tyler Refrigeration*, 777 F.2d at 689; *American Hosp. Supply Corp. v. Travenol Lab.*, 745 F.2d 1, 6 (Fed.Cir.1984). The prior art need not, however, state the elements of the claim in identical language. *See, e.g., Akzo N.V. v. U.S. Intern. Trade Com'n*, 808 F.2d 1471, 1479 (Fed.Cir.1986) (noting *Application of Brown*, 329 F.2d 1006, 1011 (C.C.P.A.1964)).

To determine whether claim 35 is anticipated by the Railroad Cookie recipe under Section 102(b), the Court must undertake a two step analysis. The first step, "of course, is construction of the claims to determine their meaning in light of the specification and prosecution history." *Kalman*, 713 F.2d at 771. The second step requires the Court to compare the properly construed claims with the subject matter described by the prior art reference and identify corresponding elements disclosed in the allegedly anticipating reference. *Titanium Metals Corp. of America v. Banner*, 778 F.2d 775, 782 (Fed.Cir.1985).

### 1. *P & G's Invention Disclosed in Claim 35*

The '333 Patent involves a cookie made from two different cookie doughs which, when baked, produce a cookie product with a crispy/chewy texture. The '333 Patent itself consists of three different classes of claims. The first class is product claims that are directed toward a final cookie product and are collectively referred to as the "cookie" claims. The second class of claims involves the cookie ingredients or dough starting materials used to manufacture the final cookie product. The third class of claims, which includes claim 35, are the "method" claims defining the process for making the final cookie product from the dough preform.

The doughs described in claim 35 are made from "typical cookie ingredients" such as sugar, flour, water and shortening. *See* D.I. 228A, Exhibit 1, '333 Patent, col. 4, lines 50–54. These doughs are conventional cookie doughs and differ only in the type of sugar that is used to prepare them. Specifically, claim 35 requires that one of the cookie doughs contain a "readily crystallizable sugar" (*i.e.*, ordinary table sugar) while the other dough must contain a "crystallization resistant sugar" (*i.e.*, invert sugar or molasses). *Id.* at col. 24, lines 25–40. The regions of dough containing the "readily crystallizable sugar" provide the crisp part of the cookie, and the chewy part of the cookie is provided by the regions of the dough containing the "crystallization resistant sugar." Claim 35 also involves the method for preparing the two doughs and then combining the two different doughs together to form a dough pre-

form prior to the step of baking. The resulting cookie product of the invention after baking the laminated dough structure is covered by other claims in the '333 Patent.

## 2. *The Railroad Cookie Recipe*

Nabisco argues that claim 35 of the '333 Patent is invalid under 35 U.S.C. § 102(b) because it embraces a method for making a cookie with a crisp and chewy texture which has been in the public domain for many years. Specifically, Nabisco believes that claim 35 is anticipated by the recipe for "Rigglevake Kucha" which was published in a 1968 cookbook entitled *Food That Really Schmecks* edited by Edna Staebler.[1] This recipe is otherwise known as the "Railroad Cookie" recipe because it calls for the preparation of a light dough containing ordinary table sugar and a dark dough containing a combination of brown sugar and molasses and then combining the two doughs together to form "pinwheel", "swirl", or "ribbon" cookies which look like a slice from a "jelly roll."

The Railroad Cookie recipe discloses a two dough cookie comprised of what the '333 Patent defines as typical cookie ingredients: sugar, flour, water and shortening. The milk used in the light dough contains water and the '333 Patent defines butter as an example of shortening. D.I. 228A, Exhibit 1, '333 Patent, col. 4 line 66 to col. 5 line 4. The two doughs disclosed in the Railroad Cookie recipe differ in their sugar content. The light dough contains only ordinary table sugar while the dark dough is comprised of a combination of brown sugar and molasses. Molasses is a syrup that contains invert sugar. Thus, the Railroad Cookie recipe discloses a cookie comprised of two doughs which contain different types of sugar. These facts are not contested by P & G.

## 3. *The Scope of Claim 35 of the '333 Patent*

Claim 35 embraces a method for preparing a cookie dough preform by first preparing two ordinary cookie doughs each comprised of different sugar properties and then applying a layer of one of the doughs to a layer of the second dough.

P & G believes that the specification of the '333 Patent makes it clear that the term "laminated dough structure" limits the breadth of claim 35 and refers only to ready-to-bake laminated dough structures which *"when baked,* produce cookies which, after equilibration, retain a crispy/chewy texture profile over long periods of time, when stored in sealed containers." (Emphasis added). D.I. 228A, Exhibit 1, '333 patent, col. 4, lines 4–6. From this premise, P & G contends that "the laminated dough structure produced by the method of claim 35 is not just any laminated dough structure, but only those *which are ready to bake into a crisp and chewy dual textured cookie."* (Emphasis added). D.I. 271 at 10; *see also* D.I. 228A, Exhibit 1, '333 patent, col. 3, line 55 to col. 4, line 6; col. 8, line 65 to col. 9, line 6. Additionally, P & G argues that claim 35 contains a limitation found in the patent specification that a "sugar crystallization phenomenon" must occur during the baking of the dough preform in order to produce a final cookie

---

1. The Railroad Cookie recipe is:
RIGGLEVAKE KUCHA (Railroad Cookie)

| Light Part: | Dark part: |
| --- | --- |
| 4 cups sugar | 1 cup sugar, brown |
| 1 egg | 1 cup butter |
| 1 cup butter | 1 cup molasses |
| ½ cup milk | ½ cup water |
| 2 teaspoons baking powder | 2 teaspoons soda |
| ½ teaspoon vanilla | ½ teaspoon vanilla |

Enough flour in each part to make dough easy to handle.
Mix the light and dark parts in separate bowls. Blend the sugar and butter for both parts. For the light part beat in the egg then alternately add the milk, vanilla and baking powder sifted with flour. For the dark part add to the butter-sugar mixture the molasses, water and vanilla alternately with enough flour.
Break off pieces of dough from both dark and light parts, shape them into rounds and roll them separately about ⅛ inch thick. Put one on top of the other, roll up like a jelly roll and slice off the pieces as thinly as you can. Place on greased cookie sheets and bake at 350 degrees till done.
D.I. 228A, Exhibit 2 at A27–A28.

with a dual textured surface.[2] D.I. 271 at 19–20, 23–24, 26–27. P & G claims that this limitation is found in the patent specification language which states that: "one dough contain[s] sugar which spontaneously crystallizes upon baking under the water content and water activity present in the cookie, while the other dough contain[s] sugar which is resistant to such crystallization under the same conditions." D.I. 271 at 24; *see also* D.I. 228A, Exhibit 1, '333 patent, col. 9, lines 1–6. Nabisco contends, on the other hand, that the patent claims, not the specification, define the alleged invention and, therefore, the only pertinent comparison is between the disclosure of the Railroad Cookie recipe and the claims of the '333 Patent.

In sum, the essential inquiry for the Court at this point is whether the language "laminated dough structure" as used in claim 35 contains a limitation that refers only to a method of combining dough preforms which, when baked, will produce a cookie with a crispy/chewy texture. In other words, does a proper construction of the scope of claim 35 require the incorporation of limitations which requires baking the dough preform and achieving a resultant crispy/chewy textured cookie.

It is an elementary proposition that the property right bestowed by a patent is measured in the first instance by the claims. *See A.B. Dick Co. v. Burroughs Corp.*, 713 F.d 700, 703 (Fed.Cir.1983) (citing *Aro Mfg. Co. v. Convertible Top Co.*, 365 U.S. 336, 339, 81 S.Ct. 599, 600–01, 5 L.Ed.2d 592 (1961)). Indeed, Title 35, Section 112 provides, in pertinent part, that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention...." 35 U.S.C. § 112. One commentator has noted: "[t]he function of the

claims is twofold: to point out what the invention is in such a way as to distinguish it from the prior art; and to define the scope of protection afforded by the patent." R. Harmon, *Patents and the Federal Circuit* 93 (1988). Thus, it is the claim, not the specification, that measures and defines the metes and bounds of the invention. *See, e.g., W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed.Cir.1983).

The significance of the claims in defining an invention was recently expressed by the Federal Circuit in *E.I. DuPont De Nemours & Co. v. Phillips Petroleum*, 849 F.2d 1430, 1433 (Fed.Cir.1988) (quoting *Autogiro Co. of America v. United States*, 384 F.2d 391, 395–96 (C.C.P.A.1967)), when Judge Bissell stated:

> The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement. [Footnote omitted]. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. [Footnote omitted]. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them.

In accordance with this instruction, the Federal Circuit has consistently adhered to the proposition that courts "cannot alter what the patentee has chosen to claim as his invention." *SSIH Equipment S.A. v. U.S. Intern. Trade Com'n*, 718 F.2d 365, 378 (Fed.Cir.1983) (citing *Autogiro*, 384 F.2d at 396); *see also Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir.

---

2. The affidavit testimony of the co-inventor Dr. Brabbs and Nabisco's Dr. Robert Ross shows that unlike conventional "crisp" cookies, which do not use crystallized sugar to produce crispness because the sugar, when baked, is in an "amorphous state, not crystal," D.I. 271A, Exhibit 8 at A133; *Id.*, at A139–A40, the sucrose in the light dough preform must crystallize in order to obtain a cookie that results in regions of crisp texture. Brabbs Affidavit, D.I. 271A, Exhibit 2, ¶¶ 4, 6. P & G further confirms this point by its assertion that "[t]his sugar crystallization phenomenon is central to the claimed invention. The proper sugars and also the proper moisture conditions must be present to produce crystallized sugar for a crisp dough region and uncrystallized, moist amorphous sugar for a chewy region." D.I. 271 at 24.

1985) ("Generally, particular limitations or embodiments appearing in the specification will not be read into the claims.").

P & G, on the other hand, cites *Kalman*, 713 F.2d at 771, for the proposition that "the language in the claims under attack [should] be interpreted in the light of the patent specification and prosecution history." D.I. 271 at 23. It is well settled that "when claim construction is required, claims are construable ... in light of the patent specification" as well as a number of other factors, such as the prosecution history and expert testimony. *SRI Intern.*, 775 F.2d at 1121; *see also Mannesmann Demag Corp. v. Engineered Metal Prod.*, 793 F.2d 1279, 1282 (Fed.Cir.1986); *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed. Cir.1985). Nevertheless, the fact "[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification *must* be read into all the claims." *SRI Intern.*, 775 F.2d at 1121 (emphasis added). The language in *Kalman* indicating that claims be interpreted "in light" of their specification to construe their proper meaning only means that the decision maker must consider the specification as one factor in claim interpretation and should "not be confused with adding an extraneous limitation appearing in the specification, which is improper." *E.I. DuPont Nemours & Co. v. Phillips Petroleum*, 849 F.2d at 1433. By "extraneous", the Federal Circuit means "a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Id.*

P & G argues that not to limit claim 35 to those laminated dough structures which, when baked, produce a crispy and chewy cookie is to read the claim in a vacuum without regard to the purpose of the '333 patent itself.[3] P & G's argument is overreaching because it would essentially require the Court to redefine the phrase "la-minated dough structure" as used in claim 35. But properly construed, the question is *not* what are the characteristics of the resultant cookie after baking but rather what is the method of laminating the two cookie doughs. P & G simply ignores the plain language of claim 35. The invention recited in claim 35 refers to a method of combining two layers of different dough preforms to form a laminated structure. There is no language, express or implied, in claim 35 which requires the additional step of baking the dough combination to achieve a dual textured cookie product. P & G's argument in this regard is reminiscent of *Lincoln Co. v. Stewart–Warner Corp.*, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938), in which the Supreme Court refused to read functional limitations into a claim where the specification of the patent at issue was silent as to the ultimate use or function of the claimed invention. Speaking for the Court, Justice Roberts stated: "[i]f this [limitation] were so vital an element in the functioning of the apparatus[,] it is strange that all mention of it was omitted." *Id.* at 550, 58 S.Ct. at 665. Similarly, in the present case, if P & G had intended to patent a method for layering two doughs together which, when baked, would produce a crispy/chewy cookie, then it should have specifically incorporated this limitation into claim 35 when it initially drafted the claim instead of attempting to persuade the Court to do so in the context of the present litigation. *See, e.g., In Re Vamco Mach. and Tool, Inc.*, 752 F.2d 1564, 1575 (Fed.Cir.1985).

Furthermore, it is inconsistent for P & G to argue that claim 35 contains baking and texture limitations when P & G expressly included these limitations in method claims 36, 37 and 45. In fact, it is claim 36, which is dependent upon claim 35, that adds the additional step of baking the dough preform prepared under the method set forth in claim 35.[4] It is indeed ironic that, in the

---

3. P & G focuses upon the alleged invention of a dual-textured cookie instead of focusing upon the particular method of laminating two doughs with different sugar properties as set forth in claim 35.

4. Claim 36 reads as follows: "A method for making a cookie having a shelf stable cross sectional texture variability typical of freshly baked cookie, according to claim 35, *which method further comprises the step of baking said*

very case P & G cites in support of its attempt to redefine the scope of claim 35, the Federal Circuit applied the well settled patent principle "that where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement." *Kalman*, 713 F.2d at 770; *see also Deere & Co. v. International Harvester Co.*, 658 F.2d 1137, 1141 (7th Cir.1981); *Cameron Iron Works v. Stekoll*, 242 F.2d 17, 21 (5th Cir.1957) (cases cited).

P & G also attempts to limit the reach of claim 35 by arguing that the laminated dough structure contains limitations on the amount of flour used and the level of thickness of the combination which are crucial in producing a cookie which is crispy and chewy after baking. This argument is misplaced, however, because the invention claimed simply involves the layering of two typical cookie doughs containing different sugar properties. There is no language in either the specification or claim 35 which makes flour content and thickness critical elements for the doughs used in the '333 Patent. The composition of the Railroad Cookie recipe doughs are entirely consistent with the description of the typical ingredients for cookie doughs set forth in claim 35. Thus, properly construed, claim 35 is limited to the plain meaning of its language which only discloses a method of layering two doughs made from typical cookie ingredients and containing different types of sugar.

### 4. *Prosecution History*

Following examination by the PTO, a duly issued patent is presumed valid. 35 U.S.C. § 282. The statute also places the burden of proving facts establishing invalidity on the person asserting invalidity. The challenger must establish those facts by clear and convincing evidence and the ultimate burden of persuasion never shifts from the patent challenger. *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359–60 (Fed.Cir.1984). P & G's view that the PTO's decision to issue the '333 Patent must be given controlling

weight is mistated. Instead, the Federal Circuit has opined that "the examination procedure and result should be given appropriate consideration and due weight by the [district] court." *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed.Cir.1985). As stated in *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985), "[t]he Examiner's decision, on an original or reissue application, is never binding on a [district] court. It is, however, evidence the [district] court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence."

At issue in the present motion is the validity of claim 35. Nabisco argues that this claim is invalid because P & G claims a cookie and cookie making method which have been in the public domain since the publication of the Railroad Cookie recipe in 1968. P & G's patent and the Railroad Cookie recipe both describe how to make a cookie by laminating two types of dough—one dough made from ordinary table sugar and one dough made with invert sugar (*e.g.*, a mixture of molasses and brown sugar). During the prosecution of its patent application, however, P & G did not disclose to the PTO the admission of Mr. Hong that the patent recipe and the Railroad Cookie recipe are identical if the molasses used in the Railroad Cookie provides the dark dough with more than 15% invert sugar. *See* D.I. 228A, Exhibit 4 at A56–A57; *see also* n. 10 and accompanying text.

Furthermore, P & G represented to the PTO that because the molasses used in the Railroad Cookie recipe would result in cookies having less than 15% invert sugar in the dark dough there was a difference between the P & G patent recipe and the prior art Railroad Cookie recipe. In its proposed amendments to its patent application, P & G argued that its: "[I]nvention requires the use of a sugar having at least 15% crystallization-resistant sugar species, and preferably greater to form the chewy-textured part of the cookie. [The] Staebler [Railroad Cookie recipe] has no such teaching, suggestion, or direction." D.I. 228A,

*laminated structure."* (Emphasis added). D.I.     228A, Exhibit 1, '333 patent, col. 24, lines 41–45.

Exhibit 5 at A73. Nevertheless, it is uncontested that P & G knew that conventional molasses most likely to be used in following the Railroad Cookie recipe contained sufficient invert sugar to anticipate because P & G used such molasses products in its own two-dough cookie research. For example, a P & G employee in Canada, Ms. Karen Stevenson, used Crosby's Fancy Molasses in order to reproduce the Railroad Cookies from the recipe because "it is the type of molasses commonly sold in Canada." D.I. 228A, Exhibit 3 at A39. Counsel for P & G even admitted in papers filed before the PTO that "Ms. Stevenson used an ordinary grocery store molasses, the kind that a homemaker would likely use in baking the Railroad [C]ookies." *Id.* at A36; *see also*, n. 12. P & G also failed to inform the PTO that Crosby's Fancy Molasses used by Ms. Stevenson in her experiments contained at least 26.8% of the total sugar in the dark dough, which is sufficient to bring the invert sugar portion of the Railroad Cookie recipe within the scope of claim 35.[5] Significantly, however, P & G reported the Stevenson information about the Railroad Cookie recipe to the PTO only four days prior to issuance of the '333 Patent. As a result, these statements were not even considered by the PTO due to their "extremely late filing." *See* D.I. 228A, Exhibit 3 at A31.

Furthermore, in other research performed for the '333 Patent's co-inventors, their laboratory assistants used:

1) Domino Millhouse Molasses, which contained 30% invert sugar;

2) Delicious Food Products Company Molasses, which contains 32% to 40% invert sugar;

3) Home Maid Molasses, which contained 31% to 35% invert sugar; and

4) Colonial Specialty Food Products Molasses, which contained 31% to 41% invert sugar.

*See* D.I. 228A, Exhibit 9 at A116–A119; Exhibit 4 at A53. In addition, P & G even used molasses with greater than 15% invert sugar in its raw ingredient specification for its Duncan Hines Chocolate Chip Cookie product line. *See* D.I. 228A, Exhibit 18 at A172; Exhibit 19 at A178–A180. This evidence sugests that P & G knew that conventional molasses contained greater than 15% invert sugar, which should have been reported to the PTO during the pendency of the '333 Patent application.

■ P & G has not presented any evidence to contradict Nabisco's assertion that P & G failed to inform the PTO that it had prior knowledge that conventional molasses products contained at least 15% invert sugar by weight. Based upon the facts that: (1) P & G failed to disclose Mr. Hong's admission to the PTO; (2) the PTO did not consider the statements of Ms. Stevenson and P & G's counsel due to their extremely late filing; and (3) P & G's own research indicates that the use of conventional molasses will contain more than the required 15% invert sugar level, less deference should be given to the PTO's decision to issue claim 35 of the '333 Patent to P & G and the statutory presumption of validity under 28 U.S.C. § 282 is, therefore, less compelling.

5. *Identity of the Invention*

Once the proper scope of the claims has been determined, a party asserting that a patent claim is anticipated under Section 102 must demonstrate, *inter alia*, identity of invention. In cases like the one presently before the Court, identity of invention is a question of fact. *Kalman*, 713 F.2d at 771 (citing *Coupe*, 155 U.S. at 578–79, 15 S.Ct. 199, 204–05); *Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 F.Supp. at 1287. As the Federal Circuit has stated:

[O]ne who seeks such a finding must show that each element of the claim in

---

5. James M. Crosby, Jr., President of Crosby Molasses Co. Ltd., testified at deposition that "prior to 1978 and up until the present time, the molasses product marketed under the 'Crosby's Fancy Molasses' brand name contained over 71% by weight of the product of total sugar (sucrose plus invert sugar) and over about 35% by weight

of the product of invert sugar." D.I. 228A, Exhibit 10 at A120. Assuming that the molasses is the only source of invert sugar in the dark dough, Crosby's Fancy Molasses invert sugar comprises at least 26.8% of the total sugar in the dark dough. *See* D.I. 228 at 17–19.

issue is found, either expressly described or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice.

*Kalman,* 713 F.2d at 771, *quoted in Phillips Petroleum,* 673 F.Supp. at 1287; *see Great Northern Corp.,* 782 F.2d at 165; *Tyler Refrigeration,* 777 F.2d at 689. In short, "[a]nticipation and infringement are reciprocals ... [A] structure in a prior art reference which would infringe the patent if later in time, anticipates it if earlier in time." *See Phillips Petroleum,* 673 F.Supp. at 1287 (citing 1 P. Rosenberg, *Patent Law Fundamentals* § 7.04 (2 ed. 1986) (noting *Knapp v. Morss,* 150 U.S. 221, 228, 14 S.Ct. 81, 84, 37 L.Ed. 1059 (1893)). The Federal Circuit has also stated:

> Section 102, the usual basis for rejection for lack of novelty or anticipation, lays down certain principles for determining the novelty required by § 101, among which are the provisions in § 102(a) and (b) that the claimed invention has *not* been 'described in a printed publication in this or a foreign country,' either (a) before the invention by the applicant or (b) more than one year before the application date to which he is entitled.

*Titanium Metals,* 778 F.2d at 781. The question of anticipation over a printed publication is whether the claims at issue "read on or encompass" something which was already known by reason of disclosure in the prior art reference. *Id.* The Railroad Cookie recipe was first published in 1968, which is more than one year before P & G filed its patent application for the '333 Patent on March 3, 1981. The proper inquiry in this motion, therefore, is whether the lamination method set forth in claim 35 "reads on" the method of layering the doughs as disclosed in the Railroad Cookie recipe.

As previously construed, the method recited in claim 35 of the '333 Patent contains three elements or steps:

1) Preparing a first cookie dough from typical cookie ingredients which contains a crystallization resistant sugar;

2) Preparing a second cookie dough from typical cookie ingredients which contains a readily crystallizable sugar; and

3) Applying a layer of the second dough to the first dough, thereby creating a laminated dough structure.

D.I. 228A, Exhibit 1, '333 patent, col. 24, lines 25–40. Nabisco contends that undisputed facts demonstrate: (1) that each of the doughs claimed by P & G are individually old and non-novel and that it was well known that cookie doughs containing ordinary table sugar produced crisp cookies and that cookie doughs containing molasses (*e.g.,* invert sugar) produced soft or chewy cookies; and (2) that the layering of these two types of cookie doughs was also known prior to the issuance of the '333 Patent. The undisputed facts underlying Nabisco's motion originate from three sources: the published Railroad Cookie recipe, the '333 Patent, and admissions by P & G and the '333 Patent's co-inventors Messrs. Brabbs and Hong.

### A. The Cookie Doughs

Steps 1 and 2 of claim 35 involve the making of a cookie dough preform from two doughs with different sugar compositions. One dough contains a "crystallization-resistant sugar component comprising a mono- or di-saccharide or mixture thereof that crystallizes substantially more slowly than sucrose at water content and water activity conditions encountered in semi-moist cookies of the home-baked type." D.I. 228A, Exhibit 1, '333 patent, col. 24, lines 33–38. A preferred crystallization-resistant sugar is stated in the specification to include "mixtures of sugars of which fructose and dextrose together [*i.e.,* invert sugar] comprise at least about 15% by weight...." D.I. 228A, Exhibit 1, '333 patent, col. 5, lines 30–34. The second dough contains a "readily crystallizable sugar component comprising a mono- or di-saccharide or mixture thereof which readily and spontaneously crystallizes, at the water content and water activity encountered in semi-moist cookies of the home-baked

type." D.I. 228A, Exhibit 1, '333 patent, col. 9, lines 27–32. The specification lists sucrose (*e.g.*, ordinary table sugar) as a type of preferred readily crystallizable sugar. D.I. 228A, Exhibit 1, '333 patent, col. 9, lines 42–40. Each of these two doughs is a conventional dough[6] and is comprised of "typical cookie ingredients."[7] One of the '333 Patent's co-inventor's, Mr. Hong, recognized that prior to the issuance of the '333 Patent it was well known "that a cookie made from a dough having sucrose (ordinary table sugar) gave a crisp cookie upon being baked and stored for a week or longer." D.I. 228A, Exhibit 8 at A114. Similarly, the '333 Patent's other co-inventor, Mr. Brabbs, stated it was well known in 1979 "that a cookie made from a dough having invert sugar as the sugar gave a chewy cookie after being baked and stored for a week or longer." D.I. 228A, Exhibit 13 at A136.

Like claim 35, the doughs of the Railroad Cookie recipe are comprised of typical cookie ingredients, such as flour, water, sugar and shortening. Similarly, the Railroad Cookie recipe involves the use of two doughs which differ in their sugar content —a light dough made with ordinary table sugar and a dark dough made with molasses. The light dough contains ordinary table sugar as its only sugar. In his deposition, Mr. Hong admitted that the light dough contained "sucrose alone." D.I. 228A, Exhibit 4 at A51. Thus, the light

dough of the Railroad Cookie recipe contains a readily crystallizable sugar that meets the elements disclosed in step 2 of claim 35.

According to Mr. Hong, if the Railroad Cookie recipe disclosed how to make a cookie from two separate cookie doughs where one of the doughs contained 100% sucrose and the other dough contained a mixture of sugars, wherein at least about 15%, by weight, of the sugar in the second dough was invert sugar (*e.g.*, brown sugar and molasses), then it would anticipate claim 35 of the '333 Patent.[8] Thus, Nabisco argues that the only remaining issue of material fact is whether the molasses used in the Railroad Cookie recipe would have sufficient invert sugar for the dark dough to contain at least 15% invert sugar.

The dark dough is prepared from one cup of brown sugar, one cup of molasses, butter, water and flour. D.I. 228A, Exhibit 4 at A27. As previously discussed in the prosecution history section of the opinion, this combination of typical cookie ingredients would give the dark dough a quantity of invert sugar which would comprise approximately 26.8% of the total sugar in the dark dough when the molasses employed is the kind of molasses which P & G has admitted even a homemaker would probably be most likely to use (*i.e.*, Crosby's Fancy Molasses) in baking the Railroad Cookies.[9] Because the dark dough con-

---

6. Charles A. Hong, one of the co-inventors of the '333 Patent, stated in his deposition: "Well, I believe if you consider the inner dough or the outer dough individually, neither of them are novel in composition in themselves, they are your typical cookie doughs." D.I. 228A, Exhibit 4 at A49.

7. According to the specifications of the '333 Patent, "[b]y 'typical cookie ingredients' is meant those ingredients common to virtually all cookies, namely, sugar, flour, water, and shortening...." D.I. 228A, Exhibit 1, '333 patent, col. 4, lines 50–52.

8. In his deposition, Mr. Hong admitted that the '333 Patent and the Railroad Cookie recipe would be the same if molasses had enough invert sugar. The following is an excerpt from the transcript:

Q: So that you do believe the railroad cookies where the dark part contains 15 or more percent invert based on the total sugar com-

position falls within the scope of the dough product of your invention, correct?

     *     *     *     *     *     *

A: Okay. With all your assumptions as stated here, that would be correct.

Q: And the only assumption is that the molasses contains sufficient invert so that the dark part of the dough contains 15 or more percent invert sugar, and with that assumption, then the railroad cookie, the dough of the railroad cookie constitutes the dough product of your invention, correct?

A: I believe so.

D.I. 228A, Exhibit 4 at A51.

9. In addition, the evidence suggests that by using Crosby's Fancy Molasses during experiments that followed the Railroad Cookie recipe, P & G demonstrated that even an industrial baker would use conventional molasses that would result in the dark dough containing more than 15% invert sugar. *See supra* n. 12 and accompanying test.

tains a crystallization-resistant sugar component according the requirements of the '333 Patent, the Railroad Cookie recipe discloses step 1 of claim 35.

■ P & G argues, however, that if the molasses used in the dark dough of the Railroad Cookie recipe contains less than 17.5% invert sugar by weight, then "the method of claim 35 ... can never result ... [because] the [cookie] product would be hard or crisp throughout." D.I. 271 at 41. Because "such low invert sugar molasses is within commercial specifications and, therefore, *might* be utilized in attempting to follow the Staebler [Railroad Cookie] recipe", P & G contends that the Railroad Cookie recipe does not expressly disclose the invention. This argument, however, contradicts the statements made by P & G during the prosecution of its patent application before the PTO. Counsel for P & G admitted in a paper submitted to the PTO four days prior to the issuance of the '333 Patent that Crosby's Fancy Molasses is "an ordinary grocery store molasses, the kind that a homemaker would likely use in baking the Railroad Cookies." D.I. 228A, Exhibit 3 at A36. It has been held that a patentee's representations to the PTO during the prosecution of its patent application about the scope of the prior art is a binding admission and should "be accepted at face value" during subsequent litigation over the patent. *See In Re Nomiya*, 509 F.2d 566, 570–71 (C.C.P.A.1974); *Tyler Refrigeration Corp. v. Kysor Industrial Corp.*, 601 F.Supp. 590, 600 (D.Del.1985) (citing 2 Chisum, D. *A Treatise on Law of Patentability, Validity, and Infringement* § 5.03[3][e] (1981) ("It is well settled that an applicant's admission as to the relevant art—both in terms of available sources and in terms of scope of the art—will be accepted as binding upon him.")). Since P & G does not dispute that Crosby's Fancy Molasses contains more than the 15% invert sugar required by claim 35, there exists no genuine issue of material fact that step 2 of claim 35 is disclosed by the Railroad Cookie recipe.

Even if P & G were not estopped from relying upon its representations made before the PTO that commercial grade molasses with invert sugar less than 15% should be disregarded, P & G's own evidence indicates that only one such brand of molasses is available on the market.[10] From this evidence, P & G argues that the Railroad Cookie recipe does not disclose the patented method in claim 35. The method referred to in claim 35 refers to the layering of two doughs with opposite sugar contents. Although the claim requires a crystallization-resistant sugar of at least 15% invert sugar by weight of total sugars present,[11] it cannot be said that the mere existence of one brand of industrial grade molasses is enough to demonstrate that the Railroad Cookie fails to expressly describe claim 35 and save it from invalidity. Molasses which are marketed to homemakers on the retail level are likely to have an invert sugar content of over 20%, which is sufficient to satisfy the requirement in claim 35. For example, "Brer Rabbit" and "Grandma's" brands of molasses, which are sold through grocery stores and accounted for over 94% of the total U.S. dollar sales volume of molasses products during the prior art years 1974–78, each contain an invert sugar content well over 20%. *See* D.I. 345A, Exhibits C, D, E. Furthermore, one of P & G's purchasing agents, William Carey, admitted during his

---

10. P & G argues that "[i]n the June 12, 1986 depositions [of two P & G purchasing agents—Robert Guin and William Carey,] three commercial specifications for molasses indicating a level of invert sugar less than 17.5% were identified." *See* D.I. 361, Exhibits D, E, F. Nevertheless, of these three commercial grade molasses products, only one of them contained significantly less than 17.5% invert sugar—the CrystaFlo Molasses Granules contained only 1.5% ± 0.5. D.I. 361, Exhibit D. On the other hand, the Robustic Domestic Molasses contained 17% invert sugar, D.I. 361, Exhibit E; and the Light Brown Sugar Syrup manufactured by the Savannah Sugar Refinery contained 22.28% invert sugar, D.I. 361, Exhibit F.

11. P & G has stated that the use of a conventional molasses product which contains as little as 17.5% invert sugar by weight will yield an invert sugar level of 15% by weight of the total sugars present in the dark dough within the parameters of claim 35. D.I. 271 at 40 (citing D.I. 271A, Exhibit 2, ¶ 9 at A14–A15).

deposition that prior to the discovery of the CrystaFlo Molasses Granules which contained only 1.5% ± 0.5, invert sugar, D.I. 361, Exhibit D, he was not aware of any specification for molasses containing less than 20% invert sugar. D.I. 345A, Exhibit B at 56–57. In fact, Mr. Carey admitted that he did not even begin searching for molasses products that contained less than 20% invert sugar until P & G's counsel requested him to do so in April, 1986, after litigation in this case had already commenced. *Id.* at 57. Because an overwhelming majority of the other molasses brands most likely to be used to follow the Railroad Cookie recipe contain enough invert sugar to fulfill the recitations of claim 35, P & G's argument that the possible availability of industrial grade molasses with an invert sugar content less than 17.5% does not vitiate Nabisco's claim of anticipation. The discovery of the Crysta–Flo Molasses Granules for the purposes of this litigation, therefore, does not produce a genuine dispute about a material fact.

P & G also argues that there is no anticipation because the Railroad Cookie recipe is silent or indefinite with respect to the flour content and the thickness of the combined doughs. P & G believes that the Railroad Cookie recipe's instruction for an amount of flour that will make the dough "easy to handle" is vague and, if too much flour is used, there will not be enough moisture for the sucrose to crystallize. This argument is spurious because the '333 Patent itself simply states that "sugar, flour shortening and water when combined in almost any *reasonable proportion* will produce a dough that can be baked to form a cookie." D.I. 228A, Exhibit 1, '333 patent, col. 11, lines 6–8. Thus, it is fruitless to claim that enough flour to make the dough "easy to handle" as described in the Railroad Cookie recipe is not "reasonable" as set forth in claim 35. The fact that moisture may be driven off if too much flour is used or if the cookie dough is sliced too thin is beside the point. Because claim 35 as construed contains no baking or texture limitations, it cannot now be argued that claim 35 is saved from invalidity because the prior art reference may produce

a dough that, when baked, does not yield a crispy/chewy cookie. *See* discussion *infra* at 765–766.

Moreover, the language of claim 35 does not mention a requirement that the cookie dough contain a minimum level of thickness. P & G speculates that if the instructions of the Railroad Cookie recipe are followed and the cookie is sliced "as thinly as you can", then one might overbake or underbake the dough. P & G contends that if the cookie is too thin, it would also be hard and crisp throughout and be in a glassy, amorphous state, not crystallized. P & G thus argues that laminated dough structures which are "thin" and bake into hard cookies are not included with the scope of claim 35. In support of this theory, P & G offers the following testimony of Mr. Hong:

Q: Have you ever considered before today, whether a layer of dough can be too thin to have the finished baked product to provide the dichotomy necessary to practice your invention?

\* \* \* \* \* \*

A: Yes.

Q: And what was your conclusion when you considered it before today?

A: That it may be too thin.

D.I. 271A, Exhibit 1B at A7. Nevertheless, P & G's argument is immaterial in light of the fact that the scope of claim 35 is not so broad as to include dough preforms which, when baked, produce a crispy/chewy cookie.

## B. The Layering Method of Claim 35

The method of the invention set forth in claim 35 is to form a laminate of the two doughs outlined in steps 1 and 2. The '333 Patent states that "[l]aminated dough structures may be formed by a variety of techniques, such as ... by laminating alternating sheets of crisp and chewy doughs, and rolling and slicing to form a 'pinwheel' structure." D.I. 228A, Exhibit 1, '333 patent, col. 10, lines 42–51. Similarly, the Railroad Cookie recipe describes the creation of a layered dough structure by "break[ing] off pieces of dough from both

[dough] parts ... and roll[ing] them separately about ⅛ inch thick. Put one [dough] on top of the other, roll up like a jelly roll and slice off as thinly as you can." D.I. 228A, Exhibit 2 at A28.

The '333 Patent itself refers to "pinwheel" cookies as an example of the alleged invention produced by the lamination method. D.I. 228A, Exhibit 1, '333 patent, col. 20, line 65 to col. 21, line 15. In example 5(3) of the '333 Patent, entitled "Pinwheel Cookies", two cookie doughs are separately rolled, one dough is placed on top of the other and the combination is "rolled up in a jelly roll fashion." D.I. 228A, Exhibit 1, '333 patent, col. 20, line 65 to col. 21, line 3. The Railroad Cookie produced by this layering method is often called a "swirl", "pinwheel" or "ribbon" cookie and appears "like a slice from a jelly roll." In his deposition, Mr. Hong even admitted that the Railroad Cookie recipe "contain[ed] a laminate of two different doughs." D.I. 228A, Exhibit 4 at A51. Mr. Hong further admitted that he believed there existed "some pinwheel cookies and some other types of cookies or pastries which were laminated." D.I. 228A, Exhibit 4 at A50. Because the Railroad Cookie recipe discloses a method of layering two different dough preforms to achieve a "pinwheel" cookie, there can be no doubt that it meets the elements set forth in claim 35 for a "laminated dough structure" and, therefore, "reads on" step 3 of claim 35.

### 6. *Enablement*

In addition to identity of invention, anticipation requires that a prior art reference must be enabling, thus placing the allegedly disclosed matter in the possession of the public. *Akzo N.V.*, 808 F.2d at 1479 (citing *In Re Brown*, 329 F.2d at 1011); *Titanium Metals*, 778 F.2d at 781; *Phillips Petroleum*, 673 F.Supp. at 1287. Thus, a prior art reference in a printed publication cannot anticipate an invention under section 102(b) unless it is enabling. *In Re Donahue*, 766 F.2d 531, 533 (Fed.Cir. 1985) (citing *In Re Borst*, 345 F.2d 851, 855 (C.C.P.A.1965); *Freeman v. Minnesota Min. and Mfg. Co.*, 693 F.Supp. 134, 147 (D.Del.1988). Even so, prior art references are presumed to be enabling. *In Re Sasse*, 629 F.2d 675, 681 (C.C.P.A.1980) (citing *In Re Jacobs*, 318 F.2d 743, 745–46 (C.C.P.A. 1963)); *see also In Re LeGrice*, 301 F.2d 929, 933 (C.C.P.A.1962). Therefore, P & G bears the burden of proving that there was no enabling technique in the Railroad Cookie recipe for making a layered dough structure as required by claim 35.

P & G argues that the Railroad Cookie recipe does not anticipate claim 35 under the doctrine of inherency unless it contains directions which "always ... produce products meeting all of the claim limitations." *Gore*, 721 F.2d at 1554. P & G concludes that if one skilled in the art could not inherently produce a dual-textured cookie product by following the Railroad Cookie recipe, then claim 35 is not anticipated. P & G's argument is misplaced, however, because it improperly focuses on the characteristics of the *baked* cookie doughs instead of on the preparation of two different doughs and the subsequent layering method expressly described in the Railroad Cookie recipe. The proper inquiry to determine enablement in this motion is whether the Railroad Cookie recipe will produce dough preforms which, when combined, produce a laminated dough structure, not whether a crispy/chewy cookie results when the combined doughs are baked. Nevertheless, because P & G has declined to offer any evidence whatsoever which could raise even the slightest doubt that the Railroad Cookie recipe has ever failed to produce such a layered dough structure, P & G has failed to meet its evidentiary burden to establish a factual conflict on the issue of enablement under Federal Rule of Civil Procedure 56(e).

Moreover, Nabisco offers uncontroverted evidence from P & G's own research department that one of its employees, Karen Stevenson, was able to produce the required dough preform. *See* D.I. 228A, Exhibit 3 at A39. In her Declaration to the PTO during the pendency of the '333 Patent, Ms. Stevenson stated that by following the Railroad Cookie recipe she was able to prepare a combined dough preform in her very first attempt that met the criteria for

a dough as called for in claim 35.[12] *Id.* Therefore, Nabisco has satisfied its evidentiary burden of establishing no genuine issue of material fact exists with respect to the enabling issue because it is uncontested that the record demonstrates that the Railroad Cookie recipe expressly described how to produce a layered dough preform structure with doughs containing the specific starting ingredients as set forth in claim 35.

### 7. *Conclusion*

■ In sum, Nabisco has demonstrated that no genuine issue of material fact exists that the Railroad Cookie recipe discloses in a printed publication more than one year prior to the filing of the '333 Patent a method of preparing two doughs containing different types of sugar as required in claim 35 of the '333 Patent. Nabisco has shown that Mr. Hong admitted the doughs containing typical cookie ingredients are not in and of themselves novel types of doughs. Mr. Hong also admitted that if the molasses used in the Railroad Cookie recipe contained more than 15% invert sugar, then the '333 Patent discloses the same type of cookie as the Railroad Cookie recipe. P & G even admitted before the PTO that Crosby's Fancy Molasses is one likely to be used in following the Railroad Cookie recipe and it is uncontroverted that Crosby's contains more than 15% invert sugar. Nabisco has also demonstrat-

ed by clear and convincing evidence that the method of layering the two doughs together to form a laminated dough structure as disclosed in the '333 Patent "reads on" the method of combining two doughs with different sugar contents together as instructed by the Railroad Cookie recipe. In addition, P & G has failed to offer any evidence that the Railroad Cookie recipe does not disclose a method for making a layered dough structure from doughs containing different kinds of sugar. Therefore, the Court concludes that claim 35 is invalid under 35 U.S.C. § 102(b) as anticipated by the Railroad Cookie recipe.

### IV. FRITO–LAY'S MOTION FOR INVALIDITY OF THE METHOD CLAIMS 35, 36, 37 and 45

Frito–Lay has moved for partial summary judgment that the method claims 35, 36, 37 and 45 of the '333 Patent are invalid under recent Federal Circuit law.[13] Frito–Lay's motion is premised upon the Federal Circuit's holding in *In Re Durden,* 763 F.2d 1406. Frito–Lay argues that P & G has admitted in a "Supplemental Arts Statement" filed before the PTO, D.I. 245, Exhibit A, that the actual steps of the method invention amount to using a non-novel baking process to bake non-novel doughs into a cookie, which may have a novel attribute (*e.g.,* a crispy/chewy texture).[14] Frito–Lay contends that this evidence reveals that the

---

**12.** Ms. Stevenson prepared the light dough by adding flour in quarter-cup portions until it was "easy to handle" as called for in the Railroad Cookie recipe. D.I. 228A, Exhibit 3 at A39. In preparing the dark dough, she used Crosby's Fancy Molasses "because it is the type of molasses commonly sold in Canada." *Id.* This molasses contains 35% invert sugar which satisfies the 15% minimum invert sugar requirement called for in claim 35. Once the dough was prepared, Ms. Stevenson stated that she "layered the dough in two ways: one where the dark dough was on top of the light dough and one where the light dough was on top of the dark dough. I then rolled the layered dough like a jelly roll." *Id.* at A40.

**13.** Because claim 35 has been held invalid under Section 102(b) as anticipated by the Railroad Cookie recipe, it is no longer necessary to decide Frito–Lay's motion with respect to that claim.

**14.** The claims of the '333 Patent at issue in the present motion involve the method claims 36, 37 and 45 which set forth a process for preparing two cookie doughs containing different sugar properties. Claim 36 is dependent upon claim 35 and only adds the additional requirement of baking the laminated dough structure. D.I. 228A, Exhibit 1, '333 Patent, col. 24, lines 41–45. Claim 37 describes a similar process but calls for separately baking the doughs before "adherently contacting" them together. *Id.* at col. 24, line 46 to col. 25, line 6. Finally, claim 45 also describes a process for preparing two cookie doughs with different sugar properties and then "substantially enveloping" them and thereafter baking and tempering the combined doughs to achieve a cookie with a crispy/chewy surface texture. *Id.* at col. 25, line 42 to col. 26, line 15.

method claims are old and anticipated by the prior art and that P & G may only argue the novelty of its starting materials (*e.g.*, the cookie doughs) and the end product obtained (*e.g.*, the crispy and chewy cookie). D.I. 319 at 5–9. Consequently, Frito–Lay concludes that under the Federal Court's holding in *Durden*, the method claims of the '333 Patent are invalid as a matter of law.

*Durden* involved an appeal from the decision of the PTO Board of Appeals affirming an examiner's rejection of a single method claim remaining in an application for a chemical process of making certain compounds as obvious and non-novel in light of a U.S. patent previously issued to Punja, No. 3,843,669. The appellants in *Durden* were granted patent claims directed toward the end product (the carbamate compound) and the starting materials (oxime compounds). Similarly, the PTO granted P & G a patent on claims for the starting materials (*e.g.*, the cookie dough preform) and the claims for the final product (*e.g.*, crispy/chewy cookie), which Frito–Lay concedes for the purpose of this motion are novel and non-obvious. In *Durden*, however, the PTO examiner denied the appellants' claim directed toward the process of making the novel compounds. The United States Patent and Trademark Office Board of Appeals affirmed the examiner's rejection of the process claims.

On appeal, the Federal Circuit in *Durden* was confronted with the issue of "whether a chemical process, otherwise obvious, is patentable *because* either or both the specific starting material employed and the product obtained, are novel and unobvious." *Id.* at 1408. The Federal Circuit recognized that the issue had been extensively debated, *see, e.g., Application of Larsen*, 292 F.2d 531 (C.C.P.A.1961); *Ex Parte Wagner*, 88 U.S.P.Q. 217 (Bd.Pat. App.1950); *Ex parte MacAdams, Wu and Joyner*, 206 USPQ 445 (Bd.Pat.App.1978); *Application of Albertson*, 332 F.2d 379

(C.C.P.A.1964); *Application of Kuehl*, 475 F.2d 658 (C.C.P.A.1973), and hoped to "possibly to put an end for now to this potentially endless debate on what the 'law' is." *Durden*, 763 F.2d at 1410. Nevertheless, the Federal Circuit declined the invitation to adopt a *per se* rule on the issue and specifically noted:

> We are sure that there are those who would like to have us state some clear general rule by which all cases of this nature could be decided. Some judges might be tempted to try it. But the question of obviousness under § 103 arises in such an unpredictable variety of ways and in such different forms that it would be an indiscreet thing to do. Today's rule would likely be regretted in tomorrow's case.

*Durden*,[15] 763 F.2d at 1411.

Instead, the Court decided to rely on "another principle followed in obviousness issue cases, which is to decide each case on the basis of its own particular fact situation." *Id.* at 1410. Although it agreed with the appellants that both the starting materials and the final product are factors which must be considered in assessing the obviousness of the claimed process "as a whole", the Court drew a crucial distinction between novelty under Section 102 and obviousness under Section 103. The Court stated:

> Of course, an otherwise old process becomes a *new* process when a previously unknown starting material, for example, is used in it which is then subjected to a conventional manipulation or reaction to produce a product which may also be *new*, albeit the *expected* result of what is done. But it does not necessarily mean that the whole process has become *unobvious* in the sense of § 103.

*Id.* The Court affirmed the PTO's decision and rejected the appellants' argument that an otherwise old process with a predictable outcome is unobvious where it is applied to

---

**15.** In *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1268 (Fed.Cir.1986), the Federal Circuit noted that the issue in *Durden* "was resolved only as a factual matter." While the Federal Circuit may not have adopted a *per se*

rule of unpatentability of obvious method claims in *Durden*, it did seem to require under Section 103 an overall inquiry into the obviousness of the method as a whole.

a new starting material because "[w]ere this true, every step, for example, dissolving or heating, when performed on a new compound would result in a new patentable process." *Durden,* 763 F.2d at 1410. Thus, *Durden,* may properly be viewed as only requiring an overall inquiry into the obviousness of a method or process claim as a whole under Section 103 and does not pronounce a *per se* rule of patentability.

Assuming *arguendo* that Frito–Lay is correct in its belief that the claims of the '333 Patent which involve the starting materials and the final cookie product are novel and non-obvious, and also assuming *arguendo* that *Durden* is on "all fours" with the present case, Frito–Lay must still demonstrate by clear and convincing evidence that the method claims in the '333 Patent are obvious under Section 103. In making a determination on obviousness under Section 103, the Supreme Court has set forth as "background" a three part factual inquiry that "[t]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Frito–Lay introduces the Rossen, Werner and Forkner patents as prior art for the purpose of establishing that the method claims at issue are obvious under the criteria set forth in *John Deere.*[16]

P & G argues that these prior art references do not establish the obviousness of the method of layering in claims 36, 37 and 45 because these patents do not teach or disclose certain "central limitations" to the patented method, such as the sugar crystallization phenomenon or baking the laminated dough structure to an end point consistent with moisture migration and tempering. Nevertheless, these "central limitations" relied upon by P & G to distinguish the patented invention from the prior art references are not expressly included in the language of claims 36, 37 and 45. Whether the limitations as described in the specification of the '333 Patent are to be incorporated into the specific language of the method claims is another matter. *Cf. E.I. DuPont De Nemours & Co. v. Phillips Petroleum,* 849 F.2d at 1432–34. Without deciding the issue, the evidence tends to suggest that these cited patents demonstrate the obviousness of the lamination method recited in claims 36, 37 and 45 at issue in this motion under Section 103.

In addition to the initial three part obviousness inquiry, the Supreme Court stated in *John Deere* that: "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *John Deere,* 383 U.S. at 17–18, 86 S.Ct. at 693–694. Although the language used in *John Deere* suggests that the inquiry into secondary considerations "may" be relevant to non-obviousness, the Federal Circuit has repeatedly held that objective evidence of non-obviousness must "always" be taken into account, "not just when the decision maker is in doubt." *See Cable Elec. Products, Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1026 (Fed.Cir.1985) (citing *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1539 (Fed.Cir.1983).

Furthermore, a "nexus between the merits of the claimed invention and the evi-

---

**16.** The Rossen patent, U.S. Patent No. 3,851,084, D.I. 319, Exhibit B, suggests that "snack products" formed by laminating layers of different doughs which may have different textures, such that one dough "substantially envelopes" the other dough as defined in Claim 45. The Rossen patent, D.I. 319, Exhibit B, col. 1, lines 22–25. The Werner patent, U.S. Patent No. 3,689,280, D.I. 319, Exhibit C, suggests a process for "producing dough products having at least two portions each characterized by a different flavor or ingredient throughout." The Werner patent, D.I. 319, Exhibit C, col. 1, lines 14–16. The Werner patent also suggests the technique of "substantially enveloping" one dough with another as that term is defined in claim 45. *Id.,* col. 4, line 50 to col. 6, line 5. Finally, the Forkner patent, U.S. Patent No. 4,020,188, D.I. 319, Exhibit E, explicitly suggests a food product with a filling that is "substantially enveloped" by a dough back-up material which is then "substantially enveloped" by a base dough. The Forkner patent, D.I. 319, Exhibit E, col. 21, line 43 *et seq.*

dence of secondary considerations is required in order for the evidence to be given substantial significance in an obviousness decision." *Cable Elec. Products*, 770 F.2d at 1026 (citing *Simmons Fastener Corp. v. Illinois Tool Works*, 739 F.2d 1573, 1575); *see also Stratoflex*, 713 F.2d at 1539. Thus, "the weight to be accorded evidence on secondary considerations is to be carefully appraised in relation to the facts of the actual case in which it is offered." *Cable Elec. Products*, 770 F.2d at 1026; *see also EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 908 (Fed.Cir.1985).

P & G offers evidence of secondary considerations such as: (1) the failure of others in the art to develop the process of making a dual-textured cookie from the Rossen, Werner and Forkner patents; (2) the process of utilizing moisture migration to produce a dual-textured cookie is a departure from the prior art attempts to produce fresh tasting shelf stable cookies; (3) expressions of disbelief or unobviousness by the Defendants that the use of crystallizing and non-crystallizing sugars would yield a crisp/chewy cookie; (4) alleged copying of the "process" by each of the Defendants; and (5) the long felt need in the baking industry and consumers for a method to a produce homemade cookie that would remain fresh for an extended period of time. D.I. 316 at 19–26. Frito–Lay argues, on the other hand, that P & G has failed to show the required nexus between the merits of the "claimed invention" (a/k/a the method of laminating two doughs with opposite sugar contents) and the evidence of secondary considerations. Frito–Lay contends that this evidence is based upon the "central limitations" which P & G has attempted to read into the method claims but cannot be found in the express language of the method claims. Since the secondary consideration evidence refers to characteristics or the successful marketing of the final crisp/chewy cookie rather than to the method claims themselves, Frito–Lay believes that P & G has failed to prove the required nexus and, therefore, has also failed to raise a genuine issue of material fact with respect to the issue of non-obviousness. *See, e.g., Chore-Time Equipment*, 713 F.2d at 778–79; *Stratoflex*, 713 F.2d at 1539; *Soldier Removal Co. v. United States Intern. Trade*, 582 F.2d 628, 637 (C.C.P.A.1978).

■ Although Frito–Lay's argument is not entirely without merit, it is unclear whether P & G's evidence of secondary considerations regarding the "claimed invention" refers solely to the "process" of making a dual-textured cookie product by virtue of the process of sugar crystallization, moisture migration and tempering the combined doughs or whether it refers to the "process" of the actual method of laminating two different doughs. Because any doubt must be resolved in favor of the non-moving party, *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983), the Court finds a genuine issue of material fact exists to be resolved at trial with respect to the issue of non-obviousness of the method claims of the '333 Patent. Because such a question precludes a finding that the method claims 36, 37 and 45 are obvious under Section 103, the rule set forth in *Durden* cannot be applied to the method claims in the present motion. Consequently, the Court denies the Defendant Frito–Lay's motion for partial summary judgment.

## V. FRITO–LAY'S MOTION FOR INVALIDITY OF CLAIM 35 UNDER 35 U.S.C. § 102(g) AND UNENFORCEABILITY OF THE ENTIRE PATENT IN SUIT

This motion encompasses two separate and distinct issues. Frito–Lay seeks summary judgment that claim 35 is invalid under 35 U.S.C. § 102(g). D.I. 318. Because it has been previously determined that claim 35 is invalid under Section 102(b), it is not necessary to decide Frito–Lay's motion that claim 35 is invalid under Section 102(g). Frito–Lay also contends that P & G obtained a patent on claim 35 with deceptive intent by allegedly concealing anticipatory prior art from the PTO, which, if true, would render all the claims of the '333 Patent unenforceable as a matter of law

under 35 U.S.C. § 288.[17] D.I. 319 at 3; *see, e.g., J.P. Stevens & Co. Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1561–62 (Fed.Cir. 1984). In order to make out a case for a breach of the duty of candor or disclosure before the PTO in prosecuting a patent application, the Federal Circuit has held that in "establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO." *Driscoll v. Cebalo,* 731 F.2d 878, 884 (Fed.Cir.1984); *see also Orthopedic Equip. Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1383 (Fed.Cir.1983); *J.P. Stevens & Co. Inc.,* 747 F.2d at 1562. Frito–Lay argues that there is no genuine issue of material fact as to whether P & G acted with deceptive intent in obtaining the issuance of claim 35 by the PTO. Although Frito–Lay's evidence shows that P & G failed to inform the PTO that Mrs. Savage used the method recited in claim 35 in experiments prior to any collaborative effort by Messrs. Hong and Brabbs, Frito–Lay has not unequivocally demonstrated by clear and convincing evidence at this stage of the proceedings that P & G acted with deceptive intent.

■ Frito–Lay's motion for partial summary judgment on the issue of inequitable conduct is denied because there exists a genuine issue of material fact to be resolved at trial with respect to whether P & G's failure to inform the PTO of the prior work of Mrs. Savage was an intentional misrepresentation.

## VI. CASE OR CONTROVERSY

In a letter to the Court dated March 8, 1988, P & G asked the Court to deny the Defendants' three motions seeking partial summary judgment of invalidity of claims 35, 36 and 37 for lack of any case or controversy because P & G has not asserted any infringement of these claims in its Complaint.

The Defendants' counterclaim for declaratory relief is based upon 28 U.S.C. § 2201 which provides in pertinent part: "In the case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration...." The presence of an "actual controversy" is a prerequisite to the court's jurisdiction in an action seeking a declaratory judgment. *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). The requirement of an actual controversy represents a congressional recognition of the limitation of federal judicial power contained in the "case or controversy" provision of Article III, Section 2 of the Constitution. *See Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986); *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). Furthermore, the standard for finding a justiciable "case or controversy" is not any less stringent in a declaratory judgment action than in an action seeking traditional coercive relief. *Bender,* 475 U.S. at 541, 106 S.Ct. at 1331; *Los Angeles v. Lyons,* 461 U.S. 95, 111–13, 103 S.Ct. 1660, 1670–71, 75 L.Ed.2d 675 (1983).

Whether a party has presented a justiciable case or controversy in an action seeking declaratory relief or merely has presented an abstract or hypothetical question must be determined on a case-by-case basis. *Babbit v. Farm Workers,* 442 U.S. 289, 297–98, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979); *Simmonds Aerocessories v. Elastic Stop Nut Corp.,* 257 F.2d 485, 489 (3rd Cir.1958) (whether there is an actual controversy is a question which turns on the facts of each individual case). The United States Supreme Court has provided a well-established principle that the "controversy must be definite and concrete, touching the legal relations of parties having adverse legal interest ... and must be a real and substantial controversy admit-

---

**17.** Although it has been determined that claim 35 is invalid under 35 U.S.C. § 102(b) as anticipated by the Railroad Cookie recipe, neither Frito–Lay nor the other Defendants are precluded from arguing the issue of inequitable conduct and patent unenforceability at trial.

ting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). Although the considerations set forth in the *Aetna Life* case are something less than a sure guide to decision, *McCahill v. Borough of Fox Chapel*, 438 F.2d 213, 215 (3rd Cir.1971), the Supreme Court has stated that in determining the difference between an abstract question and a controversy in an action for declaratory judgment, the basic "question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). And, "an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975).

The case or controversy requirement for a patent invalidity declaratory judgment counterclaim can be brought against a party if two conditions are satisfied. First, the declaratory judgment "defendant in such an action must have engaged in conduct that created on the part of the declaratory judgment plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question." *Jervis B. Webb Co. v. Southern Systems, Inc.*, 742 F.2d 1388, 1398 (Fed.Cir.1984); *C.R. Bard, Inc. Schwartz*, 716 F.2d 874, 879 (Fed.Cir. 1983). Second, "the plaintiff seeking a declaration of invalidity must have actually produced the accused device or have actually prepared such a device." *Jervis B. Webb*, 742 F.2d at 1399; *see also Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 439 F.2d 871, 875 (1st Cir.1971). Because it is uncontested that all three declaratory judgment plaintiffs produced, or at the very least prepared to produce, a cookie product which allegedly infringed the meth-

od claim 45, this element of the test has been satisfied in this case.

In support of its letter asking to dismiss the Defendants' declaratory judgment actions, P & G cites to the Federal Circuit's recent decision in *Grain Processing Corp. v. American Maize–Products*, 840 F.2d 902 (Fed.Cir.1988). In *Grain Processing*, the Federal Circuit affirmed the District Court's refusal to adjudicate the validity of claims in the patent-in-suit which were no longer being asserted as infringed, where there was a declaratory judgment counterclaim attacking those claims. The plaintiff in *Grain Processing* had originally asserted that all of the patent's claims had been infringed but, before the case went to trial, the plaintiff dropped its allegation of infringement with respect to the claims in question. On appeal, the Federal Circuit held that there was no "jurisdictional predicate for declaratory judgment" of any case or controversy of the non-asserted claims where the declaratory judgment plaintiff has no "reasonable apprehension" that it will face an infringement suit. *Grain Processing*, 840 F.2d at 906.

P & G's reliance upon the result in the *Grain Processing* case is misplaced because the facts in the present case are contrary to the three fundamental facts which the Federal Circuit found crucial in *Grain Processing*. First, the Federal Circuit concluded that the patentee had abandoned the allegation in its original complaint that the defendant had infringed the method claims in question. In the present case, P & G has asserted that it would rely only on six claims at trial on the issue of infringement, *e.g.*, claims 10, 29, 42, 45, 46 and 48. P & G argues that the Defendants' summary judgment motions seek an adjudication of invalidity of claims 35, 36 and 37 which are not now in controversy. Nevertheless, P & G has not abandoned its charge of infringement against the non-trial claims. For example, when P & G amended its Complaint, it did not drop the charge of infringement of claim 35 even though it did not select to prosecute infringement of this claim at trial. In fact, P & G has only chosen to limit the evidence it

intends to bring at trial to prove its infringement case by selecting six claims which are representative of the '333 Patent. Although P & G claims that this Court recognized in a previous opinion that "P & G has stipulated that it will rely on the same six claims in its patent for each of Defendants' cookies," *Procter & Gamble Co. v. Nabisco Brands, Inc.,* 604 F.Supp. 1485, 1492 (D.Del.1985), unlike the facts in *Grain Processing,* P & G had not "steadfastly refused to assert infringement" of the asserted claims which were not selected as the representative trial claims.

Moreover, the record is not devoid of any suggestions that the Defendants will be faced with a similar infringement suit in the future. P & G has never informed any of the Defendants in this case that it will not sue them in the future if they develop a new method or process of laminating doughs together. Because P & G has selected a narrow method claim (*e.g.,* claim 45) as one of its representative claims at trial which is narrower in scope than claim 35, any findings of non-infringement of claim 45 could force P & G to assert infringement of claim 35 in a later suit. *See, e.g., In Re Kroekel,* 803 F.2d 705, 707 (Fed. Cir.1986); *In Re Kaplan,* 789 F.2d 1574, 1577 (Fed.Cir.1986) (claim narrower in scope cannot be infringed without infringing a claim broader in scope). Furthermore, the subject matter of one of Frito-Lay's motions involves inequitable conduct before the PTO with respect to claim 35 which, if proven, would render the entire '333 Patent unenforceable. *See J.P. Stevens & Co.,* 747 F.2d at 1561–62. P & G can not be permitted to circumvent the Defendants' charges of inequitable conduct by "picking and choosing" which claims it will prosecute and which claims it will not prosecute as infringing. *See, e.g., Shelcore, Inc. v. Durham Industries, Inc.,* 745 F.2d 621, 624 (Fed.Cir.1984) ("By voluntarily dismissing [one of the claims at issue,] Shelcore [attempted] to remove the validity issue because Durharm's counterclaim [of declaratory judgment] put all the claims in issue."); *see also Jervis B. Webb Co.,* 742 F.2d at 1399–1400 n. 8 (Federal Circuit noted that if the declaratory judgment

plaintiff can satisfy the requirement of "reasonable apprehension", then it would be appropriate to adjudicate a declaratory judgment counterclaim asserting the invalidity of all of a patentee's claims in response to a complaint that asserted the infringement of less than all of the claims).

Because the fundamental facts of the *Grain Processing* case cannot be found in the present case, it can be concluded from the record that the Defendants have at least a "reasonable apprehension" that P & G could bring suit on the non-asserted trial claims in the future. Thus, the Defendants have satisfied their evidentiary burden to maintain their declaratory judgment counterclaim.