**MEHL/BIOPHILE INTERNATIONAL CORP., et al., Plaintiffs,**

v.

**Sandy MILGRAUM, M.D., et al., Defendants.**

**Civil Action No. 97–1174.**

United States District Court, D. New Jersey.

May 18, 1998.

---

Jeffrey A. Schwab, Michael Aschen, Abelman, Frayne & Schwab, New York City, George A. Arkwright, Terrence L.B. Brown, Arlington, VI, Vincent J. Paluzzi, Sterns & Weinroth, Trenton, NJ, for Plaintiffs.

Joseph J. Fleischman, James P. Flynn, Hannoch Weisman, Roseland, NJ, William F. Lee, Wayne L. Stoner, James M. Hall, Hale & Dorr, Boston, MA, Thomas A. Reed, Palomar Medical Technologies, Inc., Lexington, MA, for Defendants.

### OPINION

WOLIN, District Judge.

Much of the public discourse on hair these days involves how to generate hair. Recently, television commercials have used a professional basketball player and a professional football coach to show that a certain product grows hair on the crown of the head. Unfortunately, hair removal is not discussed as often. In fact, it is unclear whether any product or process exists to remove hair permanently. Hair removal, like hair generation, could be a lucrative industry.

In this case, the Patent and Trademark Office ("PTO") granted Dr. Nardo Zaias, plaintiff, patent 5,059,192 ("'192"), which covers a method for removing hair. Zaias along with Mehl/Biophile International Cor-

poration ("Mehl"), plaintiff, and Selvac Acquisitions Corporation ("Selvac"), plaintiff, filed suit against Dr. Sandy Milgraum, Palomar Medical Technologies, Inc. ("Palomar"), and Spectrum Medical Technologies, Inc. ("Spectrum") ("defendants"), for infringing its patent by manufacturing and selling the Epilaser®, which is a device that removes hair.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants now move for summary judgment. They argue that the '192 patent is invalid because prior art anticipated it and/or made it obvious. They also seek attorneys' fees.

For the reasons expressed *infra*, the Court has found that one of the pieces of prior art anticipated the '192 patent. Thus, the Court will grant defendants' motion for summary judgment. The Court has decided this motion without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.

## BACKGROUND

### I. Lasers and Hair

#### A. Lasers

Lasers produce light of a certain type, and are classified by the material in them that is "excited" to produce the light, e.g., argon gas and ruby. Depending on the material in the laser, the laser produces light with a given wavelength, which is measured in nanometers ("nm"). For example, a ruby laser produces light with a wavelength of 694 nm, which is in the red area of the spectrum of visible light.

Certain lasers emit light in "pulses" as opposed to a continuous wave of light. When a pulse of laser light strikes a target, it creates a spot, and the size of the spot is called the "spot size," which is measured in "millimeters" ("mm"). The energy of the pulses of light is expressed in "joules," or in terms of "fluence," the energy per unit area covered by the laser beam spot when it hits a target, which is expressed as joules per square centimeter ($j/cm^2$). The pulses a laser produces have a duration ("width"), which is measured in fractions of a second, e.g., nanosecond ("ns" or billionths of a sec-

ond), microsecond (millionths of a second), or millisecond ("ms" or thousandths of a second). The wavelength, energy, fluence, spot size, and duration of the pulses are the parameters of the laser.

The laser at issue in this case is a Q-switched ruby laser. The Q-switched ruby laser has a much shorter pulse than an ordinary ruby laser. It was invented before Zaias received the patent in this case.

Since the early 1960's, studies have been performed on how lasers can be used to treat the skin. In the early 1980's, researchers at the Massachusetts General Hospital, including Dr. R. Rox Anderson, invented selective photothermolysis, which involves using a laser wavelength that the target selectively absorbs. The wavelength must have an energy level that effects a change on the target, and a pulse duration that does not conduct thermal energy to the surrounding tissue.

### B. Hair

Hair grows out of the skin. More specifically, the hair shaft grows out of a hair "follicle," which is a tubular aperture in the dermis, i.e., skin. The root of the hair at the base of the follicle is called the "papilla." In the papilla, a dark pigment called melanin exists in granules, which are called melanosomes. To prevent hair regrowth, one must destroy the papilla.

According to Zaias, prior to the '192 patent, the only commercial methods for hair depilation were plucking out hair with tweezers, waxing, shaving, depilatory creams, electrolysis, or radio frequency devices. None of those methods permanently remove hair.

### II. The '192 Patent

#### A. Events Prior to the Application for the Patent

After their discovery of selective photothermolysis in the early 1980's, seven researchers/doctors, including Dr. Luigi Polla, Dr. R. Rox Anderson, and Dr. Jeffrey Dover, at the Massachusetts General Hospital wrote and published an article in 1987 entitled "Melanosomes Are a Primary Target of Q–Switched Ruby Laser Irradiation in Guinea Pig Skin" ("1987 Article"). (Stoner Decl.Ex. 3). The

purpose of their study was to "document the tissue damage induced by Q-switched ruby laser pulses in ... guinea pigs ... in an effort to define the nature and extent of pigmented cell injury." Their study used selective photothermolysis.

The parameters of the Q-switched ruby laser were: ".08–1.2 j/cm$^2$ in single 40–ns duration full width at half maximum pulses at a wavelength of 694 nm." The laser beam hit a circular aperture, which was held to the skin of the guinea pigs, of 2.5 millimeters in diameter. The authors waxed the backs of the guinea pigs prior to using the laser. They found that (1) "melanin is the fundamental target of energy absorption," (2) the laser could injure melanosomes at the right exposure without injuring unmelanized organelles, (3) when increasing radiant exposure doses were used, melanin containing cells showed degenerative alterations, (4) "pigmented structures in the deep dermis such as hair follicles are affected," and (5) dermis-epidermis separation occurred at appropriate radiant exposures. In Figure One, the authors showed the disruption of the hair follicles of one of the guinea pigs. The authors concluded that their study might provide a biological basis for using the Q-switched ruby laser for removing tattoos.

The authors of the 1987 article continued to conduct research on the Q-switched ruby laser, and published additional articles. A 1989 article also failed to discuss hair depilation.

The named inventor of the '192 patent is Zaias, who is a dermatologist in Florida and a major shareholder and director of Mehl. Zaias has spent many years of his practice dealing with hair depilation. Zaias performs hair depilations, and along with Thomas Mehl, the founder of Mehl, has developed, manufactured, and sold several devices that use radio frequency energy to remove hair. Prior to December 1989, Zaias had never used a laser to try to remove hair. (Stoner Decl.Ex. 11 (Zaias dep.)).

In December 1989, Zaias attended a convention of the American Academy of Derma-

tology. Spectrum had a booth at the meeting to market its Q-switched ruby laser, the Spectrume RD–1200, which uses selective photothermolysis to remove tattoos without leaving scars. "Patient treatment with the SPECTRUM RD–1200[ ] are accomplished by delivering laser energy of 5–10 joules/cm$^2$, at a wavelength of 694 nm, through an articulate arm in a 5 mm or 7 mm spot size. A 20–40[ns] pulse is delivered every 2 seconds...." (Stoner Decl.Ex. 14). The Spectrum RD–1200 uses selective photothermolysis to fracture the pigment particles in the skin. In essence, pigment chromophores, and not the surrounding tissue, selectively absorb the laser's energy so that the risk of scarring is reduced. At the time of the meeting, Spectrum had conducted encouraging tests on the RD–1200's application to benign pigmented lesions.

Zaias went to Spectrum's booth, and spoke to Spectrum representatives about the RD–1200. At that time or shortly thereafter, he obtained a brochure/instruction manual ("manual") for the RD–1200. The manual described the RD–1200 and how it was used to treat patients, contained before and after photographs of patients who had tattoos removed with the RD–1200, and discussed how the laser could perform selective photothermolysis on melanin-bearing cells in the skin. While reading the manual, Zaias observed that the before and after photographs showed that the laser had removed hair from the patients' skin. Zaias admitted at his deposition that viewing the photographs sparked the idea of using the Q-switched ruby laser to remove hair. (Stoner Decl.Ex. 13).[1] The manual, however, did not discuss hair depilation.

Following this observation, Zaias telephoned Dr. R. Rox Anderson, the physician who performed the treatments in the manual, to discuss the hair that the RD–1200 had removed. Dr. Anderson interrupted Zaias and told him not to worry about it because it would grow back. Zaias concluded that Anderson did not appreciate the potential use of the RD–1200 to achieve hair depila-

---

1. In his declaration, Zaias states that his observation of hair loss in the manual supported his theory that a laser could damage papilla, cause the hair to fall out, and delay or prevent regrowth. (Zaias decl. ¶ 17).

tion. (Zaias Decl. ¶ 19). Ultimately, Zaias ordered an RD–1200.

On January 16, 1990, Zaias contacted his patent attorneys about preparing a patent application because he believed that he was the first person to develop a method for using a laser to destroy the melanin in papilla. Prior to filing his patent application, Zaias forwarded a copy of the 1987 article to his patent attorneys. On April 24, 1990, Zaias filed an application for a patent for hair depilation that would not damage the surrounding tissue. Zaias submitted the 1989 article and an article written in 1988 to the PTO. The parameters discussed in the application are similar to those listed in the manual. Zaias admitted at his deposition that the RD–1200 had accomplished hair removal with the same parameters of his invention. (Stoner Decl.Ex. 17). Zaias did not, however, tell the PTO about the manual or what the RD–1200 had accomplished.

Prior to filing his patent application, Zaias had not performed any experiments on how a Q-switched ruby laser could remove hair. In fact, Zaias did not receive the RD–1200 until November 1990, which is six months after he filed his patent application. Zaias did not own a Q-switched ruby laser before he received the RD–1200.[2]

Zaias conceded at his deposition that the '192 patent used a laser treatment others developed and employed. Moreover, Zaias admitted that Dr. Anderson's laser dermatology method is the same as his but for the fact that Dr. Anderson did not recognize that the method could be used for hair depilation. In essence, Zaias claimed that he used a laser, which others developed, for a new purpose, i.e., hair depilation. Zaias stated that his method is to use

> a laser to illuminate a section of the skin with the parameters of the laser radiation selected so that it passes through the skin, largely without effect, but is absorbed by the dark pigment located in the papilla

..., where the laser causes sufficient damage to the papilla to delay or prevent the hair's regrowth—without injuring the surrounding skin.

On October 22, 1991, the PTO granted the '192 patent to Zaias, who still owns the patent. Zaias exclusively licensed the '192 patent to Mehl's wholly owned subsidiary, Technologies, Inc., which is now Selvac. Laser Industries of Israel also has a license for the '192 patent. Plaintiffs rebuked Palomar's, the parent of Spectrum, attempt to obtain a license under its patent. On March 13, 1997, the Food and Drug Administration ("FDA") granted Mehl's request to market the Chromos 694, a hair depilation system that employs Zaias's patented method. Six days earlier, the FDA gave Palomar clearance to sell the Epilaser®, which employs a laser to remove hair. Along with others, Dr. Anderson developed the Epilaser in the 1990's by combining it with features of the RD–1200.

### B. The '192 Patent

The '192 patent has one independent claim (Claim One) and five dependent claims (Claims Two through Six). Claim One provides:

A method of hair depilation, comprising the steps of:

(a) aligning a laser light applicator substantially vertically over a hair follicle opening, said applicator having an aperture of sufficient area to surround a hair follicle and overlie its papilla;

(b) applying through said aperture to the hair follicle a pulse of laser energy of a wavelength which is readily absorbed by the melanin of the papilla and having a radiant exposure dose of sufficient energy and duration to damage its papilla so that hair regrowth is prevented and scarring of the surrounding skin is avoided.

---

**2.** During his deposition, Zaias also testified that he had done experiments prior to filing his patent application. He claims that a hurricane destroyed the results of those experiments. In any event, he found that sixty to eighty percent of the hair grew back. Even though his patent stated that the device accomplished "permanent substantial hair removal," he did not inform the PTO of these results. The Court concludes that the inconsistency in the deposition transcript undermines Zaias's assertion that he performed any experiments because he did not receive the RD–1200 until after he filed his application for a patent and because he did not own another laser.

Claims Two through Six provide the parameters of the patented method, and are thus dependent on Claim One.

Claim Two requires that the laser's light must be applied through an aperture of at least three millimeters. In the specification, the patent states that the port in the aperture needs to be between three and eight millimeters depending on the area of the body. The aperture plate is held in contact with the skin to deliver the pulses of the Q-switched ruby laser. Claim Three provides that the radiant exposure should be between $.4 \text{ j/cm}^1$ and $10 \text{ j/cm}^2$ for less than one microsecond. Claim Four requires the method to apply an energy pulse from a Q-switched ruby laser that is sufficient to destroy melanosomes. Claim Five states that the duration of the pulse should be between thirty to forty nanoseconds. Claim Six provides that the wavelength of the laser energy should closely match the absorption spectrum of the melanin. In the specification, the patent states that 694 nm is the preferred wavelength. Finally, the specification states that the laser uses selective photothermolysis.

At his deposition, Zaias admitted that the aperture described in his patent referred to the output port of the handpiece of the RD-1200. Zaias then stated that the output port was the only aperture he had ever used. (Stoner Decl.Ex. 29). However, Zaias uses lasers other than the RD-1200 to perform hair depilation because he believes that the RD-1200 does not work as well as some of the other lasers.

## C. Experts' Opinions About Claims

Defendants hired Dr. Jeffrey Dover to provide an expert opinion on whether the '192 patent was anticipated by the 1987 article and the RD-1200. Dr. Dover is an Associate Professor of Clinical Dermatology at Harvard Medical School, and is Associate Chairman of the Department of Dermatology at the Beth Israel Deaconess Medical Center in Boston. Since the mid-1980's, Dr. Dover has performed a great deal of research on the use of lasers for dermatological applications and the effects of lasers on the skin.

Dr. Dover has written or co-authored many articles, including the 1987 article.

Dr. Dover found that the laser treatment in the 1987 article and the laser treatment described in the manual are within the same parameters as those stated in the '192 patent. According to Dr. Dover, the only difference between the 1987 article and the '192 patent is Claim Two—the '192 patent states that the aperture through which the laser pulses are applied must be at least 3 millimeters whereas the 1987 article describes an aperture of 2.5 millimeters. Dr. Dover opined that "this difference is trivial and insignificant, and it would have been obvious to a person skilled in the field of the use of lasers in dermatology to use an aperture 3 mm or larger instead of 2.5 mm." (Dover Decl. ¶ 8). He added that Claim One explains that the aperture must be large enough to surround a hair follicle and its papilla, and that an aperture of 2.5 mm can perform that task. Thus, Dr. Dover concluded that the 1987 article and the manual have "sufficient information to enable a person skilled in the field of laser dermatology to perform the treatment" described in the '192 patent. (Dover Decl. ¶ 9).

William Michael Davies, plaintiff's expert, is the Consultant Clinical Physicist at the Department of Medical Physics and Clinical Engineering at Singleton Hospital in South Wales. He has been the chairman and member of General Medical Physics Topic Group and a member of the Scientific Committee and Professional Committee. Davies has been involved with laser safety and has promoted the introduction of therapeutic lasers into local service.

Davies determined that no one had ever discussed removing hair with a laser in a published article prior to the '192 patent. In addition, Davies found that the authors of the 1987 article had not developed a method of depilating hair with a laser despite their impressive academic credentials. In comparing the claims of the '192 patent to the 1987 article and the manual, Davies found that neither the 1987 article nor the manual teaches the steps in Zaias's method because neither one discussed nor focused on hair depilation. He added that the waxing performed in the 1987 article removes both the

hair shaft and the papilla. Moreover, Davies stated that the RD–1200 would not reliably cause photothermolysis to the papilla because it fractures the pigment particles. Thus, he found that the overlap in parameters of the RD–1200 and the '192 patent was coincidental.

Davies opined that "neither document, alone or combined with all the prior art ... would have rendered the subject matter of the '192 patent as a whole obvious at the time the invention was made to a person having ordinary skill in the subject matter of the patent." Davies argued that no one, including the authors of the 1987 article, had invented the Zaias method even though the market for a safe and painless hair depilation method was financially lucrative. Finally, Davies reviewed other articles co-authored by Anderson, and found that a 1996 article states that the 1987 articles does not teach hair depilation.

## III. Procedural History

On March 11, 1997, plaintiffs filed their Complaint against defendants. On April 11, 1997, plaintiffs filed an Amended Complaint with three counts: (1) Dr. Sandy Milgraum, a dermatologist in New Jersey, is infringing the '192 patent by using the Epilaser® for hair removal; (2) Palomar and Spectrum are infringing the '192 patent by manufacturing, promoting, and selling the Epilaser® for hair removal; and (3) the defendants engaged in unfair competition in violation of New Jersey common law by "improperly, illegally and unfairly" promoting and selling the Epilaser® for use in hair removal prior to FDA approval for such use. Plaintiffs' Amended Complaint seeks injunctive relief and damages.

On August 11, 1997, this Court granted defendants' motion to dismiss plaintiffs' New Jersey common law unfair competition claim to the extent it sought redress for violations of the Food, Drug and Cosmetic Act ("FDCA") or the Federal Drug Administration ("FDA"). The Court also ruled that plaintiff could proceed on the New Jersey common law unfair competition claim so long as the Court did not have to interpret or apply the FDCA or the FDA regulations.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants now move for summary judgment on the first two counts.

## DISCUSSION

### I. Legal Precepts

#### A. Standard for Summary Judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.CIV. P. 56(c); *see Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *See Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons,* 871 F.2d 409, 419 (3d Cir.1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *See id.*

When the non-moving party bears the burden of proof at trial, the moving party's burden can be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition to a motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

**B. Summary Judgment in Patent Cases**

■ The fact that this case deals with patent infringement and this motion involves the validity of a patent does not render this case unsuitable for disposition by summary judgment. Although patent infringement cases often raise complex, factual issues, "the rules do not change simply because the case involves patent law." *Aid Pack, Inc. v. Beecham, Inc.,* 641 F.Supp. 692, 694 (D.Mass. 1986), *aff'd,* 826 F.2d 1071 (Fed.Cir.1987) (citing *D.M.I. Inc. v. Deere & Co.,* 755 F.2d 1570, 1573 (Fed.Cir.1985)). "Summary judgment is appropriate in patent cases as in other cases under Rule 56(c)." *Procter & Gamble Co. v. Nabisco Brands, Inc.,* 711 F.Supp. 759, 761 (D.Del.1989).

In fact, the Federal Circuit has repeatedly upheld the grant of summary judgment in patent infringement cases where there was no genuine issue of material fact. *See, e.g., George v. Honda Motor Co., Ltd.,* 802 F.2d 432, 434 (Fed.Cir.1986); *Porter v. Farmers Supply Serv., Inc.,* 790 F.2d 882, 884 (Fed. Cir.1986). Thus, the Federal Circuit has advised that "[w]here no issue of material fact is present ... courts should not hesitate to avoid an unnecessary trial by proceeding under [Rule] 56." *Chore–Time Equip., Inc. v. Cumberland Corp.,* 713 F.2d 774, 778–79 (Fed.Cir.1983).

■ "In accordance with *Chore–Time,* it is incumbent on the trial judge to look beyond mere denials or arguments with respect to issues of scope and content of the prior art, differences between the prior art and the invention in suit, level of skill in the art or other factual issues." *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1571 (Fed.Cir.1984).

It is with these tenets in mind that the Court considers the defendants' motions for summary judgment.

**II. Is the '192 Patent Invalid: Anticipation**

**A. Basic Test**

■ A product is not patentable unless it is new. Determining whether a product is "new" within the meaning of the patent statute requires comparing the product with the products of the relevant prior art. *See Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 619 (Fed.Cir.), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). If a single piece of relevant prior art contains all the elements of the patent at issue, the prior art is said to have anticipated the patent. *See Structural Rubber Prods. Co. v. Park Rubber Co.,* 749 F.2d 707, 715–16 (Fed.Cir.1984). "Anticipation is a question of fact." *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991).

Under 35 U.S.C. § 102(a) and (b), a patent is invalid as anticipated if the claimed invention:

(a) ... was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) ... was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

Both subsections apply to this case. The Court need not differentiate between the two because the analysis is the same for both subsections.

Courts have interpreted § 102 to require that "each and every element as set forth in the claim [be] found, either expressly or inherently described, in a single prior art reference." *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1570 (Fed.Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988).

Defendants must prove anticipation by clear and convincing evidence because patents are presumed to be valid. *See* 35 U.S.C. § 282; *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1177 (Fed.Cir.1993). "Although this burden remains on the challenger, it may be more easily met where the challenger produces prior art that is more pertinent than that considered by the [PTO]." *Ryco, Inc. v. Ag-bag Corp.*, 857 F.2d 1418, 1423 (Fed.Cir. 1988).

To determine whether a patent is anticipated by prior art under § 102, the Court must undertake a three-step analysis. The first step is to construe the patent claims to determine their meaning in light of the specification and prosecution history. Since *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), the interpretation of patent claims falls within the exclusive province of the Court. The standard to be applied for claim construction is what one of ordinary skill in the art at the time of the invention would have understood the term to mean. *See id.* at 986. The process is akin to statutory interpretation and must be viewed through the lens of objectivity with no inquiry as to the subjective intent of the inventor. *See General Elec. Co. v. Nintendo Co., Ltd.*, 983 F.Supp. 512, 519 (D.N.J.1997) (citing *Markman*, 52 F.3d at 987). Thus, to ascertain the meaning of a patent claim, a court should examine (1) the claims of the patent, (2) the specification, (3) the patent's prosecution history, and (4) extrinsic evidence. *See Markman*, 52 F.3d at 979.

The claims establish the limits or boundaries of the patent while the specification, of which the claims are a part, contains a written description of the invention that would enable one of ordinary skill in the art to make and use the invention. *See id.* at 979–80. "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Id.* (quoting *In re Vogel*, 57 C.C.P.A. 920, 422 F.2d 438, 441 (1970)). Indeed, a patentee can be his own lexicographer. *See id.* at 980 (citing *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 396–98 (1967)). The written description, however, "does not delimit the right to exclude. That is the function and purpose of claims." *Id.*

Prosecution history is of primary significance to claim construction; it permits scrutiny of the proceedings that occurred at the PTO. *See id.* at 980. "The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims." *Id.* Yet, like the written description, the prosecution history cannot "enlarge, diminish, or vary" claim limitations. *Id.* (citing *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 12 Otto 222, 227, 26 L.Ed. 149 (1880); *Intervet Am., Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed.Cir.1989)).

Lastly, extrinsic evidence through expert testimony lends understanding to the patent boundaries, but also may not vary or contradict the claims themselves. *See id.* at 980–81. "The court may, in its discretion, receive extrinsic evidence in order 'to aid the court in coming to a correct conclusion' as to the 'true meaning of the language employed' in the patent." *Id.* at 980 (quoting *Seymour v. Osborne*, 78 U.S. 516, 11 Wall. 516, 546, 20 L.Ed. 33 (1870)).

The second step in assessing whether a prior art anticipates a patent requires the Court to compare the properly construed claims with the subject matter described in the prior art reference and identify the corresponding elements disclosed in the allegedly anticipating reference. *See Titanium Metals Corp. of America v. Banner*, 778 F.2d 775, 782 (Fed.Cir.1985). The third step requires the Court to determine whether the prior art reference is enabling, thereby plac-

ing the allegedly disclosed matter in the possession of the public. *See Akzo N.V. v. United States Int'l Trade Comm'n,* 808 F.2d 1471, 1479 (Fed.Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). A prior art reference in a printed publication cannot anticipate an invention under § 102 unless it enables one skilled in the art to produce the invention described in the patent. Prior art references are presumed to be enabling. *See In re Sasse,* 629 F.2d 675, 681 (C.C.P.A.1980). Thus, the owner of the patent bears the burden of proving that there was no enabling technique in the prior art. *See General Elec.,* 983 F.Supp. at 533.

### B. Construing the Claims

Defendants assert that the manual and the 1987 article describe the same laser treatment in the '192 patent, and that Zaias failed to inform the PTO about the two pieces of prior art when he applied for his patent. They add that the '192's purported method of hair depilation is shown in the manual. They conclude that the patent is anticipated twice, and therefore is invalid. Defendants also argue that a complete construction of the claims is unnecessary because the prior art is the same as the claims and specification in the '192 patent.

The Court declines the invitation to adopt defendants' cursory approach to the construction of the claims in the '192 patent, and will engage in the prescribed three-step analysis. In this instance, the construction of the claims is not a difficult task because the claims are few in number and clearly and succinctly stated. Claim One is the only independent claim and establishes "a method of hair depilation." The primary steps of the method of hair depilation are to align the laser light applicator, which must have an aperture large enough to surround a hair follicle and papilla, substantially vertically over a hair follicle opening. Once the applicator and aperture are in place, a pulse of laser energy of sufficient wavelength to be absorbed by the melanin of the papilla and of sufficient dose and duration to damage the papilla is to be applied so that the hair cannot be regrown and no scarring occurs.

Claims Two through Six elaborate on Claim One by providing the parameters for the method: an aperture at least three millimeters in diameter; radiant exposure dose between .4 $j/cm^2$ and 10 $j/cm^2$ for less than one microsecond; a Q-switched ruby laser's energy pulse should be used to destroy melanosomes in the papilla; duration of thirty to forty nanoseconds; the wavelength of the laser energy should closely match the absorption spectrum of the melanin. The specification states that the wavelength should be 694 nanometers. Thus, the '192 patent provides the mechanism and the parameters for inducing hair removal.

### C. Comparing the '192 patent to the Prior Art

The parties hotly contest the comparison of the 1987 article and the manual with the '192 patent. Defendants assert that the 1987 article and the manual are anticipatory because they provide the same parameters as stated in the '192 patent. Plaintiffs counter that the 1987 article and the manual do not discuss hair depilation or every element in the '192 patent, and therefore cannot be anticipatory. Defendants respond that "to be anticipatory, a prior art reference need only disclose a method *within* the scope of the claims—*not* the full scope of the claims."

The critical inquiry when comparing the prior art to the '192 patent is whether the claims in the '192 patent create a "new" method.[3] In making that inquiry, the Court follows the "elementary principle of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if *one* them is

---

**3.** Defendants assert that the '192 patent cannot be new because laser technology and how to remove hair, i.e., destroy the papilla, were known prior to the application for the '192 patent. Although this argument does not warrant discussion, the Court notes that defendants' use of inflammatory language, i.e., plaintiffs are abusing and deceiving the patent system, does not advance their case or the civility of the law. Persuasive arguments can be made without making incendiary comments about the opposition. This is the Court's call for a kinder and gentler legal community.

in the prior art." *Titanium Metals,* 778 F.2d at 782 (finding that claims describing ranges for alloy were anticipated by prior article because ranges in claims covered those in article); *see also In re Woodruff,* 919 F.2d 1575, 1577 (Fed.Cir.1990) (finding that claims were unpatentable under § 103 because all but one of ranges for gases in claims encompassed ranges in prior patent; also ruling that lone exception was close and that prior patent permitted percentage of gas that was listed in claim's range).

The following chart will assist the analysis in this case:

|  | '192 patent | 1987 article | manual |
|---|---|---|---|
| Laser | Q-switched ruby red | Q-switched ruby red | Q-switched ruby red |
| Aperture size | 3–8 mm | 2.5 mm | 5–7 mm |
| Wavelength | 694 nm | 694 nm | 698 nm * |
| Dosage | .4–10 j/cm $^2$ | .08 – 1.2 j/cm $^2$ | 5–10 j/cm $^2$ |
| Time | 30–40 ns | 40 ns | 20–40 ns |

* The manual also states: "The ruby laser operating at 694 nm is also readily absorbed by the melanin."

The chart clearly indicates that the manual's parameters are all within the ranges provided for within the '192 patent except for the time or duration. The difference, however, is insignificant because there is a great deal of overlap between the two, and more importantly, the range of 20–40 ns in the manual contemplates the 30–40 ns listed in the '192 patent. As for the 1987 article, the aperture size differs by .5 mm from the minimum of the range in the '192 patent, and the dosage overlaps with that listed in the '192 patent. Like the difference in the duration of the laser light between the manual and the '192 patent, the difference in the dosage is insignificant because of the overlap.

The Court finds that the difference in aperture size does not mandate a conclusion that the 1987 article did not anticipate the '192 patent. When a patent contains a range that varies from the parameter in a prior art, "the applicant must show that the particular range is critical, generally by showing that the claimed range achieves unexpected results relative to the prior art range." *Woodruff,* 919 F.2d at 1578 (finding that patentability could not be found in difference in carbon dioxide range between prior art and patent application because Woodruff failed to produce such evidence) (citations omitted); *see also In re Ornitz,* 53

C.C.P.A. 716, 351 F.2d 1013 (1965) ("Appellants have failed to demonstrate that the ranges of elements or the particular single composition they prefer possess properties distinct from alloys having the ranges of composition of [the prior art's] analysis [ ].").[4]

Dr. Dover, defendants' expert, opined that the difference in apertures used in the '192 patent and that in the 1987 article "is trivial and insignificant, and it would have been obvious to a person skilled in the field of the use of lasers ... to use an aperture 3 mm or larger instead of 2.5 mm." (Dover Decl. § 9). He also found that Claim One provided that the aperture be of "sufficient area to surround a hair follicle and overlie its papilla," and that an aperture of 2.5 mm could satisfy that requirement. Dr. Davies, plaintiff's expert, did not address the difference in the size of the aperture because he focused on the prior art's failure to discuss hair depilation. The Court concludes that plaintiff's decision to not provide the Court with this type of evidence is because the difference between the apertures is not critical to the anticipation analysis.

Plaintiffs' expert contends that the '192 uses selective photothermolysis to thermally destroy the papilla whereas the manual describes a process of fracturing the pigment

4. Although *Woodruff* involved an obvious analysis, the Court finds the Federal Circuit's reasoning instructive.

particles rather than conducting thermal energy. That contention is erroneous and a misreading of the manual. Page Two of the manual explains that the RD–1200 employs selective photothermolysis, which it describes as "involv[ing] a laser wavelength that is selectively absorbed by a target (tattoo or melanin), of an energy level that effects a change on the target, with a pulse duration *that does not conduct thermal energy to surrounding tissue.*" Thus, the manual clearly states that the RD–1200 employs selective photothermolysis, and the comment about thermal energy deals with the surrounding tissue. Moreover, the discussion of fracturing the pigment particles does not, as plaintiffs' expert suggests, indicate that the RD–1200 does not use heat to eliminate tattoos.

Plaintiffs' position that neither the 1987 article nor the manual orients the laser in a substantially vertical manner is also misguided. Zaias testified at his deposition that if a laser is applied through an aperture plate that is placed in contact with the skin, the laser is positioned substantially vertically over the hair follicle opening. Even though the 1987 article and manual provide that apertures should be applied to the skin rather than a hair follicle, the Court confidently assumes that applying the aperture to the skin is no different than applying it to a hair follicle opening. Thus, the Court finds that the 1987 article and the manual implicitly applied the laser substantially vertically to the target.

### 1. New Use of an Old Process

Prior to engaging in the enablement analysis, the Court must first assess plaintiff's argument that the focus of the second element of the anticipation analysis should be the difference between the end results of the prior art rather than the similarity in the parameters. Essentially, plaintiff argues that the '192 patent is valid because it is a new use of an old process. Defendants, on the other hand, assert that whether or not the manual or the 1987 article discuss hair depilation is irrelevant because Zaias cannot patent a new benefit of an old process. As the Court will show *infra,* defendants have misinterpreted the law.

"The term 'process' means process, art or method, and *includes a new use of a known process, machine, manufacture, composition or matter or material.*" 35 U.S.C. § 100(b) (emphasis added); *see also Chisum, Chisum on Patents* § 1.03, at 1–58 ("A process is ... an operation or series of steps leading to a useful result."). Thus, "a process or method which involves only a new use of an old material is patentable." *Howes v. Great Lakes Press Corp.,* 679 F.2d 1023, 1029 (2d Cir.) (finding that invention was patentable because Howes created new use of known process), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982).

Of course, applying an old process to a new use can be patented only if it survives the other standards for patentability. *See Chisum,* 1.03[8], at 1–777. If a different use of a known process is analogous or cognate to the prior uses, it will have difficulty defeating an argument that the patent is obvious under § 103. *See Elrick Rim Co. v. Reading Tire Mach. Co., Inc.,* 264 F.2d 481, 486–87 (9th Cir.) (finding that using known paint spraying devices for spraying cement on tires was new use because Reading altered old process), *cert denied* 360 U.S. 920, 79 S.Ct. 1434, 3 L.Ed.2d 1535 (1959); *Chisum,* § 1.03[8], at 1–179. Moreover, under 35 U.S.C. § 101, a process is not patentable because it is new and useful; it must arise out of invention or discovery. *See, e.g., Elrick Rim,* 264 F.2d at 487. One cannot claim to have invented or discovered a process if someone with ordinary professional skill could have developed the process. *See, e.g., id.*

Defendants rely on *Woodruff, supra,* 919 F.2d at 1578, and *Verdegaal Brothers, Inc. v. Union Oil Co. of California,* 814 F.2d 628, 632–33 (Fed.Cir.), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987), in arguing that a new use of an old process does not make the new use patentable. In *Woodruff,* the Federal Circuit relied on, *inter alia, Verdegaal* for the proposition that "[i]t is a general rule that merely discovering and claiming a new benefit of an old process cannot render the process again patentable." 919 F.2d at 1578. The Court recognizes the apparent contradiction between that statement

of the general rule and the law discussed *supra*, but a closer review of the cases indicates that *Woodruff* and *Verdegaal* are consistent with 35 U.S.C. § 100(b) and the cases and treatise cited *supra*.

In *Verdegaal*, Verdegaal obtained a patent involving a "process for making certain known urea-sulfuric acid liquid fertilizer products." 814 F.2d at 630. To make the fertilizer, four chemicals are placed together in particular proportions to make a reaction. *Id.* The claims in Verdegaal's patent stated the proportions of the chemicals, and that the chemicals needed to be combined in a non-reactive heat sink to prevent high temperature buildup. *Id.* The heat sink was a previously made batch of fertilizer. *Id.* A third-party's prior patent claimed the same proportions, and taught that the chemicals could be added to recycled fertilizer. *Id.* at 632.

In determining that the prior patent anticipated Verdegaal's patent, the Federal Circuit rejected Verdegaal's argument that the prior patent failed to recognize the concept that the old fertilizer could serve as the heat sink. *Id.* at 633. The panel explained that the prior patent need not have explicitly identified the old fertilizer as the heat sink because it was inherent in the process. *Id.* The panel concluded that the prior patent disclosed the same process of adding the chemicals and using the old fertilizer as a mixing base.

*Woodruff* involves a similar story. Woodruff applied for a patent involving a process designed to reduce the growth of fungi on fresh fruits and vegetables by placing them in a specified, modified atmosphere. 919 F.2d at 1575. That atmosphere increases the amount of carbon monoxide and decreases the amount of oxygen in ordinary air. *Id.* A prior patent had disclosed similar ranges of gases for maintaining the fresh appearance of fresh leafy and head vegetables. *Id.* at 1576. The prior patent was concerned with

deterioration changes, including those related to bacteria. *Id.*

The Federal Circuit ruled that Woodruff's patent was obvious because the ranges of gases were virtually the same, and because Woodruff had not invented a new purpose for performing the claimed method. *Id.* at 1577. The panel stated that the prior patent's generic purpose, which was to prevent deterioration in fresh vegetables, covered the benefit claimed by Woodruff. *Id.* After articulating its version of the general rule of new benefits to old processes, the panel recognized that such benefits could be patented where an applicant made a completely new process or method from an obvious compound, *id.* at 1578 (citing *Application of Shetty*, 566 F.2d 81 (C.C.P.A.1977)), or an old compound. *Id.* (citing *In re Marshall*, 578 F.2d 301 (C.C.P.A.1978)).[5] The panel concluded, however, that Woodruff's application was obvious because the prior patent encompassed the claims in Woodruff's application. *Id.*

The difference between this case and *Verdegaal* is the end result of the processes in the patent and the prior art/patent. In *Verdegaal*, the end results of the process in the patent were the same as that in the prior art/patent. In this case, the end results differ—the patent describes hair depilation whereas the prior art involves treating skin. Despite defendants' assertions to the contrary, the difference in end results is significant because the panel in *Verdegaal* did not discuss enablement. However, the panel's language, i.e., "disclosed process," implied that its ruling on new use dictated a finding of enablement.

The difference between *Woodruff* and this case is that *Woodruff* considered obviousness.[6] A court will confront the issue of obviousness only if it finds that the prior art

---

5. In *Marshall*, the applicant sought a patent to use a drug for weight loss. The drug had been used in a much smaller dosage to treat peptic ulcers, esophagitis, gastritis, and irritable colon syndrome. The Physicians' Desk Reference ("PDR") for the drug did not discuss weight loss. The Court stated: "If anyone ever lost weight by following the PDR teachings it was an unrecognized accident. An accidental or unwitting duplication of an invention cannot constitute an

anticipation." 578 F.2d at 304. As shown in the discussion on enablement *infra*, the use of a Q-switched ruby laser for hair removal was not an accidental or unwitting duplication of an invention.

6. The Federal Circuit in *Woodruff* did not address anticipation because the PTO rejected the patent application under § 103.

did not enable someone of ordinary skill to produce the '192 patent. Moreover, the panel in *Woodruff* recognized that a completely new use of an old matter could be patentable.

Although plaintiffs could prevail by showing that their process is new, i.e., they have slightly altered the old process, *see Chisum*, § 1.03[8], at 1–167, § 1.03[8][b], at 1–171–72, the Court has foreclosed that option by determining that the claims of the '192 patent are described in the prior art. Thus, plaintiffs can only defeat anticipation by showing that the prior art did not enable Zaias to apply the process to hair removal. In other words, plaintiff must show that hair depilation was an unknown subject.

### D. Enablement

Defendants argue that plaintiffs have not produced any evidence to show that the prior art was not enabling. They assert that the manual is enabling because it provides more information about the treatment and the laser than does the '192 patent. Moreover, they state that the manual shows actual clinical results whereas Zaias did not conduct any experiments prior to filing his application for the '192 patent. Defendants also contend that the 1987 article is enabling because it contains more information about the use of the Q-switched ruby laser than does the '192 patent. Thus, they conclude that summary judgment should be granted because plaintiffs have not met their burden of showing that the prior art was not enabling. Plaintiffs counter that the settings for hair removal and tattoo removal are different, and that the prior art is not enabling because they could not teach someone skilled in the art to invent the procedure in the '192 patent.

The question this Court must answer is whether a person skilled in the art would have been able to produce the '192 patent after reading the manual and/or the 1987 article. As this Court stated ten years ago: "The publication must sufficiently describe the patented device so that one skilled in the art can recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation." *Refac Elecs. Corp. v. R.H. Macy & Co.*, 9 U.S.P.Q.2d 1497, 1504,

1988 WL 93835 (D.N.J.1988), *aff'd*, 871 F.2d 1097 (Fed.Cir.1989). In this case, the ordinary person would be someone who has knowledge of or experience with using lasers for treating dermatological issues. Thus, that person includes, but is not limited to, a dermatologist, an engineer, and a nurse who has observed procedures where lasers were used to treat skin.

The experts disagree whether someone skilled in the art could have developed plaintiff's application of the process described in the prior art. This Court finds Zaias's deposition to be more telling than either of the experts' opinions. Zaias conceded in his deposition that he did not conduct any experiments prior to filing his application for a patent, and that the RD–1200 and the manual sparked his idea for removing hair with a Q-switched ruby laser. In fact, Zaias telephoned Dr. Anderson and discussed the RD–1200's potential for hair depilation prior to filing his application for the '192 patent. Those concessions are critical because anyone skilled in the art would recognize that hair is removed when tattoos are removed with lasers. The logical conclusion is that lasers might be able to remove hair if applied in the correct fashion. Most importantly, as stated in *Refac*, enablement occurs when no experiments or further research is needed. Finally, Zaias's failure to submit the manual to the PTO indicates that he may have been concerned about the novelty of his method. In light of those facts, this Court would be hard-pressed to determine that someone skilled in the art would not look at the manual and think about removing hair.

Plaintiffs' final two arguments for why the manual did not anticipate the '192 patent are unpersuasive. Prior to this action, plaintiffs objected to defendants' use of Dr. Dover as an expert in this case because he had worked as a consultant for Palomar and Spectrum. Defendants responded that they had no relationship with Dr. Dover except for a two-week engagement on a "discreet matter" unrelated to hair removal. Plaintiffs have notified the Court that Dr. Dover appeared in a promotional videotape for defendants for the RD–1200 in 1996. They conclude that defendants' position means that the RD–1200 is

unrelated to hair depilation and cannot anticipate the '192 patent. That argument is unpersuasive because as shown *supra,* a process can be anticipated even if the prior art does not contemplate the new benefit.

In 1996, Dr. Anderson co-authored an article entitled "Damage to hair follicles by normal mode ruby laser pulses" in which the authors stated that "destruction of hair follicles based on the theory of selective photothermolysis has not been previously described." [7] (Schwab Decl.Ex. 4). They also wrote:

> Previous studies have shown deep selective damage to isolated pigmented cells in follicles in animals after Q-switched ruby laser exposures.... However, the submicrosecond pulses of Q-switched ruby lasers are probably not ideal for follicle destruction because of insufficient heat transfer during the pulse to other nonpigmented cells of the follicle.

(footnote omitted). Thus, plaintiffs conclude that the 1987 article did not teach hair depilation to someone skilled in the art, i.e., the authors.

Plaintiffs' argument is creative, but unpersuasive. Dr. Anderson's and his co-authors statement that the Q-switched ruby laser is not ideal for hair depilation merely means that they believed that the long pulses of the normal ruby laser would be more effective than the Q-switched ruby laser. They did not state that the Q-switched ruby laser could not remove hair. Even if the authors are correct about the inadequacies of the Q-switched ruby laser, the Court still finds that the manual anticipated the '192 patent because, as shown in the chart *supra,* the procedures are virtually identical. Like defendants' statements regarding Dr. Dover's consulting position, the authors' statement that destruction of hair follicles by selective photothermolysis had never been described is not dispositive because prior art can anticipate a process without having considered an application. As stated, the Court finds that the manual enabled Zaias to develop his method.

**7.** Dr. Anderson and some of his co-authors de-

Thus, the Court finds that the '192 patent is invalid because the manual anticipated its method of hair depilation. Whether the 1987 article enabled Zaias to develop his method for hair depilation is a more difficult question. That question and the issue of obviousness, however, is moot given the Court's decision on the manual.

## II. Attorneys' fees

Defendants seek attorneys' fees under 35 U.S.C. § 285, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." "Findings of exceptional case have been based on a variety of factors; for example, willful or intentional infringement, inequitable conduct before the [PTO], vexatious or unjustified litigation, or other misfeasant behavior." *Multiform Desiccants, Inc., v. Medzam, Ltd.,* 133 F.3d 1473, 1481–82 (Fed. Cir.1998).

■ Defendants have not stated any reason for why this case is exceptional. A conclusory statement that fees are justified does not show by clear and convincing evidence that the case is exceptional. The Court recognizes that Zaias's failure to submit the manual to the PTO could be considered acting in bad faith. Defendants have not produced any evidence, however, to show that Zaias's omission was intentional or willful. Thus, the Court will deny their motion for fees.

## CONCLUSION

For the reasons stated *supra,* defendants' motion for summary judgment is granted on the first two counts of plaintiffs' Complaint.

An appropriate Order is attached.

## *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 18th day of May, 1998

signed the laser Epilaser ®.

ORDERED that defendants' motion for summary judgment is granted on the first two counts of plaintiffs' Complaint.